# PENN CENTRAL TRANSPORTATION CO. ET AL. v. NEW YORK CITY ET AL.

No. 77–444.  Argued April 17, 1978—Decided June 26, 1978

Brennan, J., delivered the opinion of the Court, in which Stewart, White, Marshall, Blackmun, and Powell, JJ., joined. Rehnquist, J., filed a dissenting opinion, in which Burger, C. J., and Stevens, J., joined, *post*, p. 138.

*Daniel M. Gribbon* argued the cause for appellants. With him on the briefs were *John R. Bolton* and *Carl Helmetag, Jr.*

*Leonard Koerner* argued the cause for appellees. With him on the brief were *Allen G. Schwartz, L. Kevin Sheridan,* and *Dorothy Miner.*

*Assistant Attorney General Wald* argued the cause for the United States as *amicus curiae* urging affirmance. On the

brief were *Solicitor General McCree, Assistant Attorney General Moorman, Peter R. Steenland, Jr., and Carl Strass.*[*]

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is whether a city may, as part of a comprehensive program to preserve historic landmarks and historic districts, place restrictions on the development of individual historic landmarks—in addition to those imposed by applicable zoning ordinances—without effecting a "taking" requiring the payment of "just compensation." Specifically, we must decide whether the application of New York City's Landmarks Preservation Law to the parcel of land occupied by Grand Central Terminal has "taken" its owners' property in violation of the Fifth and Fourteenth Amendments.

## I

### A

Over the past 50 years, all 50 States and over 500 municipalities have enacted laws to encourage or require the preservation of buildings and areas with historic or aesthetic importance.[1] These nationwide legislative efforts have been

---

[*]Briefs of *amici curiae* urging affirmance were filed by *David Bonderman* and *Frank B. Gilbert* for the National Trust for Historic Preservation et al.; by *Paul S. Byard, Ralph C. Menapace, Jr., Terence H. Benbow, William C. Chanler, Richard H. Pershan, Francis T. P. Plimpton, Whitney North Seymour,* and *Bethuel M. Webster* for the Committee to Save Grand Central Station et al.; and by *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Philip Weinberg,* Assistant Attorney General, for the State of New York.

Briefs of *amici curiae* were filed by *Evelle J. Younger,* Attorney General, *E. Clement Shute, Jr.,* and *Robert H. Connett,* Assistant Attorneys General, and *Richard C. Jacobs,* Deputy Attorney General, for the State of California; and by *Eugene J. Morris* for the Real Estate Board of New York, Inc.

[1] See National Trust for Historic Preservation, A Guide to State Historic Preservation Programs (1976); National Trust for Historic Preservation,

precipitated by two concerns. The first is recognition that, in recent years, large numbers of historic structures, landmarks, and areas have been destroyed [2] without adequate consideration of either the values represented therein or the possibility of preserving the destroyed properties for use in economically productive ways.[3] The second is a widely shared belief that structures with special historic, cultural, or architectural significance enhance the quality of life for all. Not only do these buildings and their workmanship represent the lessons of the past and embody precious features of our heritage, they serve as examples of quality for today. "[H]istoric conservation is but one aspect of the much larger problem, basically an environmental one, of enhancing—or perhaps developing for the first time—the quality of life for people." [4]

New York City, responding to similar concerns and acting

Directory of Landmark and Historic District Commissions (1976). In addition to these state and municipal legislative efforts, Congress has determined that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people," National Historic Preservation Act of 1966, 80 Stat. 915, 16 U. S. C. § 470 (b) (1976 ed.), and has enacted a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance. See generally Gray, The Response of Federal Legislation to Historic Preservation, 36 Law & Contemp. Prob. 314 (1971).

[2] Over one-half of the buildings listed in the Historic American Buildings Survey, begun by the Federal Government in 1933, have been destroyed. See Costonis, The Chicago Plan: Incentive Zoning and the Preservation of Urban Landmarks, 85 Harv. L. Rev. 574, 574 n. 1 (1972), citing Huxtable, Bank's Building Plan Sets Off Debate on "Progress," N. Y. Times, Jan. 17, 1971, section 8, p. 1, col. 2.

[3] See, e. g., N. Y. C. Admin. Code § 205–1.0 (a) (1976).

[4] Gilbert, Introduction, Precedents for the Future, 36 Law & Contemp. Prob. 311, 312 (1971), quoting address by Robert Stipe, 1971 Conference on Preservation Law, Washington, D. C., May 1, 1971 (unpublished text, pp. 6–7).

pursuant to a New York State enabling Act,[5] adopted its Landmarks Preservation Law in 1965. See N. Y. C. Admin. Code, ch. 8–A, § 205–1.0 *et seq.* (1976). The city acted from the conviction that "the standing of [New York City] as a world-wide tourist center and world capital of business, culture and government" would be threatened if legislation were not enacted to protect historic landmarks and neighborhoods from precipitate decisions to destroy or fundamentally alter their character. § 205–1.0 (a). The city believed that comprehensive measures to safeguard desirable features of the existing urban fabric would benefit its citizens in a variety of ways: *e. g.,* fostering "civic pride in the beauty and noble accomplishments of the past"; protecting and enhancing "the city's attractions to tourists and visitors"; "support[ing] and stimul[ating] business and industry"; "strengthen[ing] the economy of the city"; and promoting "the use of historic districts, landmarks, interior landmarks and scenic landmarks for the education, pleasure and welfare of the people of the city." § 205–1.0 (b).

The New York City law is typical of many urban landmark laws in that its primary method of achieving its goals is not by acquisitions of historic properties,[6] but rather by involving public entities in land-use decisions affecting these properties

---

[5] See N. Y. Gen. Mun. Law § 96–a (McKinney 1977). It declares that it is the public policy of the State of New York to preserve structures and areas with special historical or aesthetic interest or value and authorizes local governments to impose reasonable restrictions to perpetuate such structures and areas.

[6] The consensus is that widespread public ownership of historic properties in urban settings is neither feasible nor wise. Public ownership reduces the tax base, burdens the public budget with costs of acquisitions and maintenance, and results in the preservation of public buildings as museums and similar facilities, rather than as economically productive features of the urban scene. See Wilson & Winkler, The Response of State Legislation to Historic Preservation, 36 Law & Contemp. Prob. 329, 330–331, 339–340 (1971).

and providing services, standards, controls, and incentives that will encourage preservation by private owners and users.[7] While the law does place special restrictions on landmark properties as a necessary feature to the attainment of its larger objectives, the major theme of the law is to ensure the owners of any such properties both a "reasonable return" on their investments and maximum latitude to use their parcels for purposes not inconsistent with the preservation goals.

The operation of the law can be briefly summarized. The primary responsibility for administering the law is vested in the Landmarks Preservation Commission (Commission), a broad based, 11-member agency[8] assisted by a technical staff. The Commission first performs the function, critical to any landmark preservation effort, of identifying properties and areas that have "a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation." § 207–1.0 (n); see § 207–1.0 (h). If the Commission determines, after giving all interested parties an opportunity to be heard, that a building or area satisfies the ordinance's criteria, it will designate a building to be a "landmark," § 207–1.0 (n),[9] situ-

---

[7] See Costonis, *supra* n. 2, at 580–581; Wilson & Winkler, *supra* n. 6; Rankin, Operation and Interpretation of the New York City Landmark Preservation Law, 36 Law & Contemp. Prob. 366 (1971).

[8] The ordinance creating the Commission requires that it include at least three architects, one historian qualified in the field, one city planner or landscape architect, one realtor, and at least one resident of each of the city's five boroughs. N. Y. C. Charter § 534 (1976). In addition to the ordinance's requirements concerning the composition of the Commission, there is, according to a former chairman, a "prudent tradition" that the Commission include one or two lawyers, preferably with experience in municipal government, and several laymen with no specialized qualifications other than concern for the good of the city. Goldstone, Aesthetics in Historic Districts, 36 Law & Contemp. Prob. 379, 384–385 (1971).

[9] " 'Landmark.' Any improvement, any part of which is thirty years old or older, which has a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural character-

ated on a particular "landmark site," § 207–1.0 (o),[10] or will designate an area to be a "historic district," § 207–1.0 (h).[11] After the Commission makes a designation, New York City's Board of Estimate, after considering the relationship of the designated property "to the master plan, the zoning resolution, projected public improvements and any plans for the renewal of the area involved," § 207–2.0 (g)(1), may modify or disapprove the designation, and the owner may seek judicial review of the final designation decision. Thus far, 31 historic districts and over 400 individual landmarks have been finally designated,[12] and the process is a continuing one.

Final designation as a landmark results in restrictions upon the property owner's options concerning use of the landmark site. First, the law imposes a duty upon the owner to keep the exterior features of the building "in good repair" to assure that the law's objectives not be defeated by the landmark's

---

istics of the city, state or nation and which has been designated as a landmark pursuant to the provisions of this chapter." § 207–1.0 (n).

[10] " 'Landmark site.' An improvement parcel or part thereof on which is situated a landmark and any abutting improvement parcel or part thereof used as and constituting part of the premises on which the landmark is situated, and which has been designated as a landmark site pursuant to the provisions of this chapter." § 207–1.0 (o).

[11] " 'Historic district.' Any area which: (1) contains improvements which: (a) have a special character or special historical or aesthetic interest or value; and (b) represent one or more periods or styles of architecture typical of one or more eras in the history of the city; and (c) cause such area, by reason of such factors, to constitute a distinct section of the city; and (2) has been designated as a historic district pursuant to the provisions of this chapter." § 207–1.0 (h). The Act also provides for the designation of a "scenic landmark," see § 207–1.0 (w), and an "interior landmark." See § 207–1.0 (m).

[12] See Landmarks Preservation Commission of the City of New York, Landmarks and Historic Districts (1977). Although appellants are correct in noting that some of the designated landmarks are publicly owned, the vast majority are, like Grand Central Terminal, privately owned structures.

falling into a state of irremediable disrepair. See § 207–10.0 (a). Second, the Commission must approve in advance any proposal to alter the exterior architectural features of the landmark or to construct any exterior improvement on the landmark site, thus ensuring that decisions concerning construction on the landmark site are made with due consideration of both the public interest in the maintenance of the structure and the landowner's interest in use of the property. See §§ 207–4.0 to 207–9.0.

In the event an owner wishes to alter a landmark site, three separate procedures are available through which administrative approval may be obtained. First, the owner may apply to the Commission for a "certificate of no effect on protected architectural features": that is, for an order approving the improvement or alteration on the ground that it will not change or affect any architectural feature of the landmark and will be in harmony therewith. See § 207–5.0. Denial of the certificate is subject to judicial review.

Second, the owner may apply to the Commission for a certificate of "appropriateness." See § 207–6.0. Such certificates will be granted if the Commission concludes—focusing upon aesthetic, historical, and architectural values—that the proposed construction on the landmark site would not unduly hinder the protection, enhancement, perpetuation, and use of the landmark. Again, denial of the certificate is subject to judicial review. Moreover, the owner who is denied either a certificate of no exterior effect or a certificate of appropriateness may submit an alternative or modified plan for approval. The final procedure—seeking a certificate of appropriateness on the ground of "insufficient return," see § 207–8.0—provides special mechanisms, which vary depending on whether or not the landmark enjoys a tax exemption,[18] to ensure that designation does not cause economic hardship.

---

[18] If the owner of a non-tax-exempt parcel has been denied certificates of appropriateness for a proposed alteration and shows that he is not earning

Although the designation of a landmark and landmark site restricts the owner's control over the parcel, designation also enhances the economic position of the landmark owner in one significant respect. Under New York City's zoning laws, owners of real property who have not developed their property

a reasonable return on the property in its present state, the Commission and other city agencies must assume the burden of developing a plan that will enable the landmark owner to earn a reasonable return on the landmark site. The plan may include, but need not be limited to, partial or complete tax exemption, remission of taxes, and authorizations for alterations, construction, or reconstruction appropriate for and not inconsistent with the purposes of the law. § 207–8.0 (c). The owner is free to accept or reject a plan devised by the Commission and approved by the other city agencies. If he accepts the plan, he proceeds to operate the property pursuant to the plan. If he rejects the plan, the Commission may recommend that the city proceed by eminent domain to acquire a protective interest in the landmark, but if the city does not do so within a specified time period, the Commission must issue a notice allowing the property owner to proceed with the alteration or improvement as originally proposed in his application for a certificate of appropriateness.

Tax-exempt structures are treated somewhat differently. They become eligible for special treatment only if four preconditions are satisfied: (1) the owner previously entered into an agreement to sell the parcel that was contingent upon the issuance of a certificate of approval; (2) the property, as it exists at the time of the request, is not capable of earning a reasonable return; (3) the structure is no longer suitable to its past or present purposes; and (4) the prospective buyer intends to alter the landmark structure. In the event the owner demonstrates that the property in its present state is not earning a reasonable return, the Commission must either find another buyer for it or allow the sale and construction to proceed.

But this is not the only remedy available for owners of tax-exempt landmarks. As the case at bar illustrates, see *infra*, at 121, if an owner files suit and establishes that he is incapable of earning a "reasonable return" on the site in its present state, he can be afforded judicial relief. Similarly, where a landmark owner who enjoys a tax exemption has demonstrated that the landmark structure, as restricted, is totally inadequate for the owner's "legitimate needs," the law has been held invalid as applied to that parcel. See *Lutheran Church* v. *City of New York*, 35 N. Y. 2d 121, 316 N. E. 2d 305 (1974).

to the full extent permitted by the applicable zoning laws are allowed to transfer development rights to contiguous parcels on the same city block. See New York City, Zoning Resolution Art. I, ch. 2, § 12–10 (1978) (definition of "zoning lot"). A 1968 ordinance gave the owners of landmark sites additional opportunities to transfer development rights to other parcels. Subject to a restriction that the floor area of the transferee lot may not be increased by more than 20% above its authorized level, the ordinance permitted transfers from a landmark parcel to property across the street or across a street intersection. In 1969, the law governing the conditions under which transfers from landmark parcels could occur was liberalized, see New York City Zoning Resolutions 74–79 to 74–793, apparently to ensure that the Landmarks Law would not unduly restrict the development options of the owners of Grand Central Terminal. See Marcus, Air Rights Transfers in New York City, 36 Law & Contemp. Prob. 372, 375 (1971). The class of recipient lots was expanded to include lots "across a street and opposite to another lot or lots which except for the intervention of streets or street intersections f[or]m a series extending to the lot occupied by the landmark building[, provided that] all lots [are] in the same ownership." New York City Zoning Resolution 74–79 (emphasis deleted).[14] In addition, the 1969 amendment permits, in highly commer-

_____

[14] To obtain approval for a proposed transfer, the landmark owner must follow the following procedure. First, he must obtain the permission of the Commission which will examine the plans for the development of the transferee lot to determine whether the planned construction would be compatible with the landmark. Second, he must obtain the approbation of New York City's Planning Commission which will focus on the effects of the transfer on occupants of the buildings in the vicinity of the transferee lot and whether the landmark owner will preserve the landmark. Finally, the matter goes to the Board of Estimate, which has final authority to grant or deny the application. See also Costonis, supra n. 2, at 585–586.

cialized areas like midtown Manhattan, the transfer of all unused development rights to a single parcel. *Ibid.*

## B

This case involves the application of New York City's Landmarks Preservation Law to Grand Central Terminal (Terminal). The Terminal, which is owned by the Penn Central Transportation Co. and its affiliates (Penn Central), is one of New York City's most famous buildings. Opened in 1913, it is regarded not only as providing an ingenious engineering solution to the problems presented by urban railroad stations, but also as a magnificent example of the French beaux-arts style.

The Terminal is located in midtown Manhattan. Its south facade faces 42d Street and that street's intersection with Park Avenue. At street level, the Terminal is bounded on the west by Vanderbilt Avenue, on the east by the Commodore Hotel, and on the north by the Pan-American Building. Although a 20-story office tower, to have been located above the Terminal, was part of the original design, the planned tower was never constructed.[15] The Terminal itself is an eight-story structure which Penn Central uses as a railroad station and in which it rents space not needed for railroad purposes to a variety of commercial interests. The Terminal is one of a number of properties owned by appellant Penn Central in this area of midtown Manhattan. The others include the Barclay, Biltmore, Commodore, Roosevelt, and Waldorf-Astoria Hotels, the Pan-American Building and other office buildings along Park Avenue, and the Yale Club. At least eight of these are eligible to be recipients of development rights afforded the Terminal by virtue of landmark designation.

On August 2, 1967, following a public hearing, the Commission designated the Terminal a "landmark" and designated the

---

[15] The Terminal's present foundation includes columns, which were built into it for the express purpose of supporting the proposed 20-story tower.

"city tax block" it occupies a "landmark site." [16]    The Board of Estimate confirmed this action on September 21, 1967. Although appellant Penn Central had opposed the designation before the Commission, it did not seek judicial review of the final designation decision.

On January 22, 1968, appellant Penn Central, to increase its income, entered into a renewable 50-year lease and sublease agreement with appellant UGP Properties, Inc. (UGP), a wholly owned subsidiary of Union General Properties, Ltd., a United Kingdom corporation. Under the terms of the agreement, UGP was to construct a multistory office building above the Terminal. UGP promised to pay Penn Central $1 million annually during construction and at least $3 million annually thereafter. The rentals would be offset in part by a loss of some $700,000 to $1 million in net rentals presently received from concessionaires displaced by the new building.

Appellants UGP and Penn Central then applied to the Commission for permission to construct an office building atop the Terminal. Two separate plans, both designed by architect Marcel Breuer and both apparently satisfying the terms of the applicable zoning ordinance, were submitted to the Commission for approval. The first, Breuer I, provided for the construction of a 55-story office building, to be cantilevered above the existing facade and to rest on the roof of the Terminal. The second, Breuer II Revised,[17] called for tearing

---

[16] The Commission's report stated:

"Grand Central Station, one of the great buildings of America, evokes a spirit that is unique in this City. It combines distinguished architecture with a brilliant engineering solution, wedded to one of the most fabulous railroad terminals of our time. Monumental in scale, this great building functions as well today as it did when built. In style, it represents the best of the French Beaux Arts." Record 2240.

[17] Appellants also submitted a plan, denominated Breuer II, to the Commission. However, because appellants learned that Breuer II would have violated existing easements, they substituted Breuer II Revised for Breuer II, and the Commission evaluated the appropriateness only of Breuer II Revised.

down a portion of the Terminal that included the 42d Street facade, stripping off some of the remaining features of the Terminal's facade, and constructing a 53-story office building. The Commission denied a certificate of no exterior effect on September 20, 1968. Appellants then applied for a certificate of "appropriateness" as to both proposals. After four days of hearings at which over 80 witnesses testified, the Commission denied this application as to both proposals.

The Commission's reasons for rejecting certificates respecting Breuer II Revised are summarized in the following statement: "To protect a Landmark, one does not tear it down. To perpetuate its architectural features, one does not strip them off." Record 2255. Breuer I, which would have preserved the existing vertical facades of the present structure, received more sympathetic consideration. The Commission first focused on the effect that the proposed tower would have on one desirable feature created by the present structure and its surroundings: the dramatic view of the Terminal from Park Avenue South. Although appellants had contended that the Pan-American Building had already destroyed the silhouette of the south facade and that one additional tower could do no further damage and might even provide a better background for the facade, the Commission disagreed, stating that it found the majestic approach from the south to be still unique in the city and that a 55-story tower atop the Terminal would be far more detrimental to its south facade than the Pan-American Building 375 feet away. Moreover, the Commission found that from closer vantage points the Pan-American Building and the other towers were largely cut off from view, which would not be the case of the mass on top of the Terminal planned under Breuer I. In conclusion, the Commission stated:

"[We have] no fixed rule against making additions to designated buildings—it all depends on how they are done . . . . But to balance a 55-story office tower above

a flamboyant Beaux-Arts facade seems nothing more than an aesthetic joke. Quite simply, the tower would overwhelm the Terminal by its sheer mass. The 'addition' would be four times as high as the existing structure and would reduce the Landmark itself to the status of a curiosity.

"Landmarks cannot be divorced from their settings—particularly when the setting is a dramatic and integral part of the original concept. The Terminal, in its setting, is a great example of urban design. Such examples are not so plentiful in New York City that we can afford to lose any of the few we have. And we must preserve them in a meaningful way—with alterations and additions of such character, scale, materials and mass as will protect, enhance and perpetuate the original design rather than overwhelm it." *Id.*, at 2251.[18]

Appellants did not seek judicial review of the denial of either certificate. Because the Terminal site enjoyed a tax exemption,[19] remained suitable for its present and future uses, and was not the subject of a contract of sale, there were no further administrative remedies available to appellants as to the Breuer I and Breuer II Revised plans. See n. 13, *supra.* Further, appellants did not avail themselves of the opportunity to develop

---

[18] In discussing Breuer I, the Commission also referred to a number of instances in which it had approved additions to landmarks: "The office and reception wing added to Gracie Mansion and the school and church house added to the 12th Street side of the First Presbyterian Church are examples that harmonize in scale, material and character with the structures they adjoin. The new Watch Tower Bible and Tract Society building on Brooklyn Heights, though completely modern in idiom, respects the qualities of its surroundings and will enhance the Brooklyn Heights Historic District, as Butterfield House enhances West 12th Street, and Breuer's own Whitney Museum its Madison Avenue locale." Record 2251.

[19] See N. Y. Real Prop. Tax Law § 489-aa *et seq.* (McKinney Supp. 1977).

and submit other plans for the Commission's consideration and approval. Instead, appellants filed suit in New York Supreme Court, Trial Term, claiming, *inter alia*, that the application of the Landmarks Preservation Law had "taken" their property without just compensation in violation of the Fifth and Fourteenth Amendments and arbitrarily deprived them of their property without due process of law in violation of the Fourteenth Amendment. Appellants sought a declaratory judgment, injunctive relief barring the city from using the Landmarks Law to impede the construction of any structure that might otherwise lawfully be constructed on the Terminal site, and damages for the "temporary taking" that occurred between August 2, 1967, the designation date, and the date when the restrictions arising from the Landmarks Law would be lifted. The trial court granted the injunctive and declaratory relief, but severed the question of damages for a "temporary taking." [20]

Appellees appealed, and the New York Supreme Court, Appellate Division, reversed. 50 App. Div. 2d 265, 377 N. Y. S. 2d 20 (1975). The Appellate Division held that the restrictions on the development of the Terminal site were necessary to promote the legitimate public purpose of protecting landmarks and therefore that appellants could sustain their constitutional claims only by proof that the regulation deprived them of all reasonable beneficial use of the property. The Appellate Division held that the evidence appellants

---

[20] Although that court suggested that any regulation of private property to protect landmark values was unconstitutional if "just compensation" were not afforded, it also appeared to rely upon its findings: first, that the cost to Penn Central of operating the Terminal building itself, exclusive of purely railroad operations, exceeded the revenues received from concessionaires and tenants in the Terminal; and second, that the special transferable development rights afforded Penn Central as an owner of a landmark site did not "provide compensation to plaintiffs or minimize the harm suffered by plaintiffs due to the designation of the Terminal as a landmark."

introduced at trial—"Statements of Revenues and Costs," purporting to show a net operating loss for the years 1969 and 1971, which were prepared for the instant litigation—had not satisfied their burden.[21] First, the court rejected the claim that these statements showed that the Terminal was operating at a loss, for in the court's view, appellants had improperly attributed some railroad operating expenses and taxes to their real estate operations, and compounded that error by failing to impute any rental value to the vast space in the Terminal devoted to railroad purposes. Further, the Appellate Division concluded that appellants had failed to establish either that they were unable to increase the Terminal's commercial income by transforming vacant or underutilized space to revenue-producing use, or that the unused development rights over the Terminal could not have been profitably transferred to one or more nearby sites.[22] The Appellate Division concluded that all appellants had succeeded in showing was that they had been deprived of the property's most profitable use, and that this showing did not establish that appellants had been unconstitutionally deprived of their property.

The New York Court of Appeals affirmed. 42 N. Y. 2d 324, 366 N. E. 2d 1271 (1977). That court summarily rejected any claim that the Landmarks Law had "taken"

---

[21] These statements appear to have reflected the costs of maintaining the exterior architectural features of the Terminal in "good repair" as required by the law. As would have been apparent in any case therefore, the existence of the duty to keep up the property was here—and will presumably always be—factored into the inquiry concerning the constitutionality of the landmark restrictions.

The Appellate Division also rejected the claim that an agreement of Penn Central with the Metropolitan Transit Authority and the Connecticut Transit Authority provided a basis for invalidating the application of the Landmarks Law.

[22] The record reflected that Penn Central had given serious consideration to transferring some of those rights to either the Biltmore Hotel or the Roosevelt Hotel.

property without "just compensation," *id.*, at 329, 366 N. E. 2d, at 1274, indicating that there could be no "taking" since the law had not transferred control of the property to the city, but only restricted appellants' exploitation of it. In that circumstance, the Court of Appeals held that appellants' attack on the law could prevail only if the law deprived appellants of their property in violation of the Due Process Clause of the Fourteenth Amendment. Whether or not there was a denial of substantive due process turned on whether the restrictions deprived Penn Central of a "reasonable return" on the "privately created and privately managed ingredient" of the Terminal. *Id.*, at 328, 366 N. E. 2d, at 1273.[23] The Court of Appeals concluded that the Landmarks Law had not effected a denial of due process because: (1) the landmark regulation permitted the same use as had been made of the Terminal for more than half a century; (2) the appellants had failed to show that they could not earn a reasonable return on their investment in the Terminal itself; (3) even if the Terminal proper could never operate at a reasonable profit, some of the income from Penn Central's extensive real estate holdings in the area, which include hotels and office buildings, must realistically be imputed to the Terminal; and

---

[23] The Court of Appeals suggested that in calculating the value of the property upon which appellants were entitled to earn a reasonable return, the "publicly created" components of the value of the property—*i. e.*, those elements of its value attributable to the "efforts of organized society" or to the "social complex" in which the Terminal is located—had to be excluded. However, since the record upon which the Court of Appeals decided the case did not, as that court recognized, contain a basis for segregating the privately created from the publicly created elements of the value of the Terminal site and since the judgment of the Court of Appeals in any event rests upon bases that support our affirmance, see *infra*, this page and 122, we have no occasion to address the question whether it is permissible or feasible to separate out the "social increments" of the value of property. See Costonis, The Disparity Issue: A Context for the *Grand Central Terminal* Decision, 91 Harv. L. Rev. 402, 416–417 (1977).

(4) the development rights above the Terminal, which had been made transferable to numerous sites in the vicinity of the Terminal, one or two of which were suitable for the construction of office buildings, were valuable to appellants and provided "significant, perhaps 'fair,' compensation for the loss of rights above the terminal itself." *Id.*, at 333–336, 366 N. E. 2d, at 1276–1278.

Observing that its affirmance was "[o]n the present record," and that its analysis had not been fully developed by counsel at any level of the New York judicial system, the Court of Appeals directed that counsel "should be entitled to present . . . any additional submissions which, in the light of [the court's] opinion, may usefully develop further the factors discussed." *Id.*, at 337, 366 N. E. 2d, at 1279. Appellants chose not to avail themselves of this opportunity and filed a notice of appeal in this Court. We noted probable jurisdiction. 434 U. S. 983 (1977). We affirm.

## II

The issues presented by appellants are (1) whether the restrictions imposed by New York City's law upon appellants' exploitation of the Terminal site effect a "taking" of appellants' property for a public use within the meaning of the Fifth Amendment, which of course is made applicable to the States through the Fourteenth Amendment, see *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 239 (1897), and, (2), if so, whether the transferable development rights afforded appellants constitute "just compensation" within the meaning of the Fifth Amendment.[24] We need only address the question whether a "taking" has occurred.[25]

---

[24] Our statement of the issues is a distillation of four questions presented in the jurisdictional statement:

"Does the social and cultural desirability of preserving historical landmarks through government regulation derogate from the constitutional

## A

Before considering appellants' specific contentions, it will be useful to review the factors that have shaped the jurisprudence of the Fifth Amendment injunction "nor shall private property be taken for public use, without just compensation." The question of what constitutes a "taking" for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty. While this Court has recognized that the "Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Armstrong* v. *United States*, 364 U. S.

requirement that just compensation be paid for private property taken for public use?

"Is Penn Central entitled to no compensation for that large but unmeasurable portion of the value of its rights to construct an office building over the Grand Central Terminal that is said to have been created by the efforts of 'society as an organized entity'?

"Does a finding that Penn Central has failed to establish that there is no possibility, without exercising its development rights, of earning a reasonable return on all of its remaining properties that benefit in any way from the operations of the Grand Central Terminal warrant the conclusion that no compensation need be paid for the taking of those rights?

"Does the possibility accorded to Penn Central, under the landmark-preservation regulation, of realizing some value at some time by transferring the Terminal development rights to other buildings, under a procedure that is conceded to be defective, severely limited, procedurally complex and speculative, and that requires ultimate discretionary approval by governmental authorities, meet the constitutional requirements of just compensation as applied to landmarks?" Jurisdictional Statement 3–4.

The first and fourth questions assume that there has been a taking and raise the problem whether, under the circumstances of this case, the transferable development rights constitute "just compensation." The second and third questions, on the other hand, are directed to the issue whether a taking has occurred.

[25] As is implicit in our opinion, we do not embrace the proposition that a "taking" can never occur unless government has transferred physical control over a portion of a parcel.

40, 49 (1960), this Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. See *Goldblatt* v. *Hempstead,* 369 U. S. 590, 594 (1962). Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." *United States* v. *Central Eureka Mining Co.,* 357 U. S. 155, 168 (1958); see *United States* v. *Caltex, Inc.,* 344 U. S. 149, 156 (1952).

In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance.. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. See *Goldblatt* v. *Hempstead, supra,* at 594. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, see, *e. g., United States* v. *Causby,* 328 U. S. 256 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

"Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 413 (1922), and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values. Exercises of the taxing power are one obvious example. A second are the decisions in which this Court has dismissed "taking" challenges on the ground that, while the challenged government action caused

economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute "property" for Fifth Amendment purposes. See, *e. g., United States* v. *Willow River Power Co.,* 324 U. S. 499 (1945) (interest in high-water level of river for runoff for tailwaters to maintain power head is not property); *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53 (1913) (no property interest can exist in navigable waters); see also *Demorest* v. *City Bank Co.,* 321 U. S. 36 (1944); *Muhlker* v. *Harlem R. Co.,* 197 U. S. 544 (1905); Sax, Takings and the Police Power, 74 Yale L. J. 36, 61–62 (1964).

More importantly for the present case, in instances in which a state tribunal reasonably concluded that "the health, safety, morals, or general welfare" would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests. See *Nectow* v. *Cambridge,* 277 U. S. 183, 188 (1928). Zoning laws are, of course, the classic example, see *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926) (prohibition of industrial use); *Gorieb* v. *Fox,* 274 U. S. 603, 608 (1927) (requirement that portions of parcels be left unbuilt); *Welch* v. *Swasey,* 214 U. S. 91 (1909) (height restriction), which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property. See *Goldblatt* v. *Hempstead, supra,* at 592–593, and cases cited; see also *Eastlake* v. *Forest City Enterprises, Inc.,* 426 U. S. 668, 674 n. 8 (1976).

Zoning laws generally do not affect existing uses of real property, but "taking" challenges have also been held to be without merit in a wide variety of situations when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm. *Miller* v. *Schoene,* 276 U. S. 272 (1928), is illustrative. In that case, a state entomologist, acting pursuant to a state statute, ordered

the claimants to cut down a large number of ornamental red cedar trees because they produced cedar rust fatal to apple trees cultivated nearby. Although the statute provided for recovery of any expense incurred in removing the cedars, and permitted claimants to use the felled trees, it did not provide compensation for the value of the standing trees or for the resulting decrease in market value of the properties as a whole. A unanimous Court held that this latter omission did not render the statute invalid. The Court held that the State might properly make "a choice between the preservation of one class of property and that of the other" and since the apple industry was important in the State involved, concluded that the State had not exceeded "its constitutional powers by deciding upon the destruction of one class of property [without compensation] in order to save another which, in the judgment of the legislature, is of greater value to the public." *Id.*, at 279.

Again, *Hadacheck* v. *Sebastian,* 239 U. S. 394 (1915), upheld a law prohibiting the claimant from continuing his otherwise lawful business of operating a brickyard in a particular physical community on the ground that the legislature had reasonably concluded that the presence of the brickyard was inconsistent with neighboring uses. See also *United States* v. *Central Eureka Mining Co., supra* (Government order closing gold mines so that skilled miners would be available for other mining work held not a taking): *Atchison, T. & S. F. R. Co.* v. *Public Utilities Comm'n,* 346 U. S. 346 (1953) (railroad may be required to share cost of constructing railroad grade improvement); *Walls* v. *Midland Carbon Co.,* 254 U. S. 300 (1920) (law prohibiting manufacture of carbon black upheld); *Reinman* v. *Little Rock,* 237 U. S. 171 (1915) (law prohibiting livery stable upheld); *Mugler* v. *Kansas,* 123 U. S. 623 (1887) (law prohibiting liquor business upheld).

*Goldblatt* v. *Hempstead, supra,* is a recent example. There, a 1958 city safety ordinance banned any excavations below

the water table and effectively prohibited the claimant from continuing a sand and gravel mining business that had been operated on the particular parcel since 1927. The Court upheld the ordinance against a "taking" challenge, although the ordinance prohibited the present and presumably most beneficial use of the property and had, like the regulations in *Miller* and *Hadacheck,* severely affected a particular owner. The Court assumed that the ordinance did not prevent the owner's reasonable use of the property since the owner made no showing of an adverse effect on the value of the land. Because the restriction served a substantial public purpose, the Court thus held no taking had occurred. It is, of course, implicit in *Goldblatt* that a use restriction on real property may constitute a "taking" if not reasonably necessary to the effectuation of a substantial public purpose, see *Nectow* v. *Cambridge, supra;* cf. *Moore* v. *East Cleveland,* 431 U. S. 494, 513–514 (1977) (STEVENS, J., concurring), or perhaps if it has an unduly harsh impact upon the owner's use of the property.

*Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922), is the leading case for the proposition that a state statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a "taking." There the claimant had sold the surface rights to particular parcels of property, but expressly reserved the right to remove the coal thereunder. A Pennsylvania statute, enacted after the transactions, forbade any mining of coal that caused the subsidence of any house, unless the house was the property of the owner of the underlying coal and was more than 150 feet from the improved property of another. Because the statute made it commercially impracticable to mine the coal, *id.,* at 414, and thus had nearly the same effect as the complete destruction of rights claimant had reserved from the owners of the surface land, see *id.,* at 414–415, the Court held that the statute was invalid as effecting a "taking"

without just compensation. See also *Armstrong v. United States,* 364 U. S. 40 (1960) (Government's complete destruction of a materialman's lien in certain property held a "taking"); *Hudson Water Co. v. McCarter,* 209 U. S. 349, 355 (1908) (if height restriction makes property wholly useless "the rights of property . . . prevail over the other public interest" and compensation is required). See generally Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1229–1234 (1967).

Finally, government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have often been held to constitute "takings." *United States v. Causby,* 328 U. S. 256 (1946), is illustrative. In holding that direct overflights above the claimant's land, that destroyed the present use of the land as a chicken farm, constituted a "taking," *Causby* emphasized that Government had not "merely destroyed property [but was] using a part of it for the flight of its planes." *Id.,* at 262–263, n. 7. See also *Griggs v. Allegheny County,* 369 U. S. 84 (1962) (overflights held a taking); *Portsmouth Co. v. United States,* 260 U. S. 327 (1922) (United States military installations' repeated firing of guns over claimant's land is a taking); *United States v. Cress,* 243 U. S. 316 (1917) (repeated floodings of land caused by water project is a taking); but see *YMCA v. United States,* 395 U. S. 85 (1969) (damage caused to building when federal officers who were seeking to protect building were attacked by rioters held not a taking). See generally Michelman, *supra,* at 1226–1229; Sax, Takings and the Police Power, 74 Yale L. J. 36 (1964).

B

In contending that the New York City law has "taken" their property in violation of the Fifth and Fourteenth Amendments, appellants make a series of arguments, which, while tailored to the facts of this case, essentially urge that

any substantial restriction imposed pursuant to a landmark law must be accompanied by just compensation if it is to be constitutional. Before considering these, we emphasize what is not in dispute. Because this Court has recognized, in a number of settings, that States and cities may enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city, see *New Orleans* v. *Dukes,* 427 U. S. 297 (1976); *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976); *Village of Belle Terre* v. *Boraas,* 416 U. S. 1, 9–10 (1974); *Berman* v. *Parker,* 348 U. S. 26, 33 (1954); *Welch* v. *Swasey,* 214 U. S., at 108, appellants do not contest that New York City's objective of preserving structures and areas with special historic, architectural, or cultural significance is an entirely permissible governmental goal. They also do not dispute that the restrictions imposed on its parcel are appropriate means of securing the purposes of the New York City law. Finally, appellants do not challenge any of the specific factual premises of the decision below. They accept for present purposes both that the parcel of land occupied by Grand Central Terminal must, in its present state, be regarded as capable of earning a reasonable return,[26] and that the transferable development rights afforded appellants by virtue of the Terminal's designation as a landmark are valuable, even if not as valuable as the rights to construct above the Terminal. In appellants' view none of these factors derogate from their claim that New York City's law has effected a "taking."

[26] Both the Jurisdictional Statement 7–8, n. 7, and Brief for Appellants 8 n. 7 state that appellants are not seeking review of the New York courts' determination that Penn Central could earn a "reasonable return" on its investment in the Terminal. Although appellants suggest in their reply brief that the factual conclusions of the New York courts cannot be sustained unless we accept the rationale of the New York Court of Appeals, see Reply Brief for Appellants 12 n. 15, it is apparent that the findings concerning Penn Central's ability to profit from the Terminal depend in no way on the Court of Appeals' rationale.

They first observe that the airspace above the Terminal is a valuable property interest, citing *United States* v. *Causby, supra.* They urge that the Landmarks Law has deprived them of any gainful use of their "air rights" above the Terminal and that, irrespective of the value of the remainder of their parcel, the city has "taken" their right to this super-jacent airspace, thus entitling them to "just compensation" measured by the fair market value of these air rights.

Apart from our own disagreement with appellants' characterization of the effect of the New York City law, see *infra,* at 134–135, the submission that appellants may establish a "taking" simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable. Were this the rule, this Court would have erred not only in upholding laws restricting the development of air rights, see *Welch* v. *Swasey, supra,* but also in approving those prohibiting both the subjacent, see *Goldblatt* v. *Hempstead,* 369 U. S. 590 (1962), and the lateral, see *Gorieb* v. *Fox,* 274 U. S. 603 (1927), development of particular parcels.[27] "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the

---

[27] These cases dispose of any contention that might be based on *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922), that full use of air rights is so bound up with the investment-backed expectations of appellants that governmental deprivation of these rights invariably—*i. e.,* irrespective of the impact of the restriction on the value of the parcel as a whole—constitutes a "taking." Similarly, *Welch, Goldblatt,* and *Gorieb* illustrate the fallacy of appellants' related contention that a "taking" must be found to have occurred whenever the land-use restriction may be characterized as imposing a "servitude" on the claimant's parcel.

parcel as a whole—here, the city tax block designated as the "landmark site."

Secondly, appellants, focusing on the character and impact of the New York City law, argue that it effects a "taking" because its operation has significantly diminished the value of the Terminal site. Appellants concede that the decisions sustaining other land-use regulations, which, like the New York City law, are reasonably related to the promotion of the general welfare, uniformly reject the proposition that diminution in property value, standing alone, can establish a "taking," see *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926) (75% diminution in value caused by zoning law); *Hadacheck* v. *Sebastian,* 239 U. S. 394 (1915) (87½% diminution in value); cf. *Eastlake* v. *Forest City Enterprises, Inc.,* 426 U. S., at 674 n. 8, and that the "taking" issue in these contexts is resolved by focusing on the uses the regulations permit. See also *Goldblatt* v. *Hempstead, supra.* Appellants, moreover, also do not dispute that a showing of diminution in property value would not establish a "taking" if the restriction had been imposed as a result of historic-district legislation, see generally *Maher* v. *New Orleans,* 516 F. 2d 1051 (CA5 1975), but appellants argue that New York City's regulation of individual landmarks is fundamentally different from zoning or from historic-district legislation because the controls imposed by New York City's law apply only to individuals who own selected properties.

Stated baldly, appellants' position appears to be that the only means of ensuring that selected owners are not singled out to endure financial hardship for no reason is to hold that any restriction imposed on individual landmarks pursuant to the New York City scheme is a "taking" requiring the payment of "just compensation." Agreement with this argument would, of course, invalidate not just New York City's law, but all comparable landmark legislation in the Nation. We find no merit in it.

It is true, as appellants emphasize, that both historic-district legislation and zoning laws regulate all properties within given physical communities whereas landmark laws apply only to selected parcels. But, contrary to appellants' suggestions, landmark laws are not like discriminatory, or "reverse spot," zoning: that is, a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones. See 2 A. Rathkopf, The Law of Zoning and Planning 26–4, and n. 6 (4th ed. 1978). In contrast to discriminatory zoning, which is the antithesis of land-use control as part of some comprehensive plan, the New York City law embodies a comprehensive plan to preserve structures of historic or aesthetic interest wherever they might be found in the city,[28] and as noted, over 400 landmarks and 31 historic districts have been designated pursuant to this plan.

Equally without merit is the related argument that the decision to designate a structure as a landmark "is inevitably arbitrary or at least subjective, because it is basically a matter of taste," Reply Brief for Appellants 22, thus unavoidably singling out individual landowners for disparate and unfair treatment. The argument has a particularly hollow ring in this case. For appellants not only did not seek judicial review of either the designation or of the denials of the certificates of appropriateness and of no exterior effect, but do not even now suggest that the Commission's decisions concerning the Terminal were in any sense arbitrary or unprincipled. But, in

---

[28] Although the New York Court of Appeals contrasted the New York City Landmarks Law with both zoning and historic-district legislation and stated at one point that landmark laws do not "further a general community plan," 42 N. Y. 2d 324, 330, 366 N. E. 2d 1271, 1274 (1977), it also emphasized that the implementation of the objectives of the Landmarks Law constitutes an "acceptable reason for singling out one particular parcel for different and less favorable treatment." *Ibid.*, 366 N. E. 2d, at 1275. Therefore, we do not understand the New York Court of Appeals to disagree with our characterization of the law.

any event, a landmark owner has a right to judicial review of any Commission decision, and, quite simply, there is no basis whatsoever for a conclusion that courts will have any greater difficulty identifying arbitrary or discriminatory action in the context of landmark regulation than in the context of classic zoning or indeed in any other context.[29]

Next, appellants observe that New York City's law differs from zoning laws and historic-district ordinances in that the Landmarks Law does not impose identical or similar restrictions on all structures located in particular physical communities. It follows, they argue, that New York City's law is inherently incapable of producing the fair and equitable distribution of benefits and burdens of governmental action which is characteristic of zoning laws and historic-district legislation and which they maintain is a constitutional requirement if "just compensation" is not to be afforded. It is, of course, true that the Landmarks Law has a more severe impact on some landowners than on others, but that in itself does not mean that the law effects a "taking." Legislation designed to promote the general welfare commonly burdens some more than others. The owners of the brickyard in *Hadacheck*, of the cedar trees in *Miller* v. *Schoene*, and of the gravel and sand mine in *Goldblatt* v. *Hempstead*, were uniquely burdened by the legislation sustained in those cases.[30] Similarly, zon-

---

[29] When a property owner challenges the application of a zoning ordinance to his property, the judicial inquiry focuses upon whether the challenged restriction can reasonably be deemed to promote the objectives of the community land-use plan, and will include consideration of the treatment of similar parcels. See generally *Nectow* v. *Cambridge*, 277 U. S. 183 (1928). When a property owner challenges a landmark designation or restriction as arbitrary or discriminatory, a similar inquiry presumably will occur.

[30] Appellants attempt to distinguish these cases on the ground that, in each, government was prohibiting a "noxious" use of land and that in the present case, in contrast, appellants' proposed construction above the Terminal would be beneficial. We observe that the uses in issue in

ing laws often affect some property owners more severely than others but have not been held to be invalid on that account. For example, the property owner in *Euclid* who wished to use its property for industrial purposes was affected far more severely by the ordinance than its neighbors who wished to use their land for residences.

In any event, appellants' repeated suggestions that they are solely burdened and unbenefited is factually inaccurate. This contention overlooks the fact that the New York City law applies to vast numbers of structures in the city in addition to the Terminal—all the structures contained in the 31 historic districts and over 400 individual landmarks, many of which are close to the Terminal.[31] Unless we are to reject the judgment of the New York City Council that the preservation of landmarks benefits all New York citizens and all structures, both economically and by improving the quality of life in the city as a whole—which we are unwilling to do—we cannot

---

*Hadacheck, Miller,* and *Goldblatt* were perfectly lawful in themselves. They involved no "blameworthiness, . . . moral wrongdoing or conscious act of dangerous risk-taking which induce[d society] to shift the cost to a pa[rt]icular individual." Sax, Takings and the Police Power, 74 Yale L. J. 36, 50 (1964). These cases are better understood as resting not on any supposed "noxious" quality of the prohibited uses but rather on the ground that the restrictions were reasonably related to the implementation of a policy—not unlike historic preservation—expected to produce a widespread public benefit and applicable to all similarly situated property.

Nor, correlatively, can it be asserted that the destruction or fundamental alteration of a historic landmark is not harmful. The suggestion that the beneficial quality of appellants' proposed construction is established by the fact that the construction would have been consistent with applicable zoning laws ignores the development in sensibilities and ideals reflected in landmark legislation like New York City's. Cf. *West Bros. Brick Co.* v. *Alexandria,* 169 Va. 271, 282–283, 192 S. E. 881, 885–886, appeal dismissed for want of a substantial federal question, 302 U. S. 658 (1937).

[31] There are some 53 designated landmarks and 5 historic districts or scenic landmarks in Manhattan between 14th and 59th Streets. See Landmarks Preservation Commission, Landmarks and Historic Districts (1977).

conclude that the owners of the Terminal have in no sense been benefited by the Landmarks Law. Doubtless appellants believe they are more burdened than benefited by the law, but that must have been true, too, of the property owners in *Miller, Hadacheck, Euclid,* and *Goldblatt.*[32]

Appellants' final broad-based attack would have us treat the law as an instance, like that in *United States* v. *Causby,* in which government, acting in an enterprise capacity, has appropriated part of their property for some strictly governmental purpose. Apart from the fact that *Causby* was a case of invasion of airspace that destroyed the use of the farm beneath and this New York City law has in nowise impaired the present use of the Terminal, the Landmarks Law neither exploits appellants' parcel for city purposes nor facilitates nor arises from any entrepreneurial operations of the city. The situation is not remotely like that in *Causby* where the airspace above the property was in the flight pattern for military aircraft. The Landmarks Law's effect is simply to prohibit appellants or anyone else from occupying portions of the airspace above the Terminal, while permitting appellants to use the remainder of the parcel in a gainful fashion. This is no more an appropriation of property by government for its own uses than is a zoning law prohibiting, for "aesthetic" reasons, two or more adult theaters within a specified area, see *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976), or a safety regulation prohibiting excavations below a certain level. See *Goldblatt* v. *Hempstead.*

## C

Rejection of appellants' broad arguments is not, however, the end of our inquiry, for all we thus far have established is

---

[32] It is, of course, true that the fact the duties imposed by zoning and historic-district legislation apply throughout particular physical communities provides assurances against arbitrariness, but the applicability of the Landmarks Law to a large number of parcels in the city, in our view, provides comparable, if not identical, assurances.

that the New York City law is not rendered invalid by its failure to provide "just compensation" whenever a landmark owner is restricted in the exploitation of property interests, such as air rights, to a greater extent than provided for under applicable zoning laws. We now must consider whether the interference with appellants' property is of such a magnitude that "there must be an exercise of eminent domain and compensation to sustain [it]." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S., at 413. That inquiry may be narrowed to the question of the severity of the impact of the law on appellants' parcel, and its resolution in turn requires a careful assessment of the impact of the regulation on the Terminal site.

Unlike the governmental acts in *Goldblatt, Miller, Causby, Griggs,* and *Hadacheck,* the New York City law does not interfere in any way with the present uses of the Terminal. Its designation as a landmark not only permits but contemplates that appellants may continue to use the property precisely as it has been used for the past 65 years: as a railroad terminal containing office space and concessions. So the law does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel. More importantly, on this record, we must regard the New York City law as permitting Penn Central not only to profit from the Terminal but also to obtain a "reasonable return" on its investment.

Appellants, moreover, exaggerate the effect of the law on their ability to make use of the air rights above the Terminal in two respects.[33] First, it simply cannot be maintained, on this record, that appellants have been prohibited from occupying *any* portion of the airspace above the Terminal. While the Commission's actions in denying applications to construct an

---

[33] Appellants, of course, argue at length that the transferable development rights, while valuable, do not constitute "just compensation." Brief for Appellants 36–43.

office building in excess of 50 stories above the Terminal may indicate that it will refuse to issue a certificate of appropriateness for any comparably sized structure, nothing the Commission has said or done suggests an intention to prohibit *any* construction above the Terminal. The Commission's report emphasized that whether any construction would be allowed depended upon whether the proposed addition "would harmonize in scale, material, and character with [the Terminal]." Record 2251. Since appellants have not sought approval for the construction of a smaller structure, we do not know that appellants will be denied any use of any portion of the airspace above the Terminal.[34]

Second, to the extent appellants have been denied the right to build above the Terminal, it is not literally accurate to say that they have been denied *all* use of even those pre-existing air rights. Their ability to use these rights has not been abrogated; they are made transferable to at least eight parcels in the vicinity of the Terminal, one or two of which have been found suitable for the construction of new office buildings. Although appellants and others have argued that New York City's transferable development-rights program is far from ideal,[35] the New York courts here supportably found that, at least in the case of the Terminal, the rights afforded are valuable. While these rights may well not have constituted "just compensation" if a "taking" had occurred, the rights nevertheless undoubtedly mitigate whatever financial burdens the law has imposed on appellants and, for that reason, are to be taken into account in considering the impact of regulation. Cf. *Goldblatt* v. *Hempstead,* 369 U. S., at 594 n. 3.

---

[34] Counsel for appellants admitted at oral argument that the Commission has not suggested that it would not, for example, approve a 20-story office tower along the lines of that which was part of the original plan for the Terminal. See Tr. of Oral Arg. 19.

[35] See Costonis, *supra* n. 2, at 585–589.

On this record, we conclude that the application of New York City's Landmarks Law has not effected a "taking" of appellants' property. The restrictions imposed are substantially related to the promotion of the general welfare and not only permit reasonable beneficial use of the landmark site but also afford appellants opportunities further to enhance not only the Terminal site proper but also other properties.[36]

*Affirmed.*

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE STEVENS join, dissenting.

Of the over one million buildings and structures in the city of New York, appellees have singled out 400 for designation as official landmarks.[1] The owner of a building might initially be pleased that his property has been chosen by a distinguished committee of architects, historians, and city

---

[36] We emphasize that our holding today is on the present record, which in turn is based on Penn Central's present ability to use the Terminal for its intended purposes and in a gainful fashion. The city conceded at oral argument that if appellants can demonstrate at some point in the future that circumstances have so changed that the Terminal ceases to be "economically viable," appellants may obtain relief. See Tr. of Oral Arg. 42–43.

[1] A large percentage of the designated landmarks are public structures (such as the Brooklyn Bridge, City Hall, the Statue of Liberty and the Municipal Asphalt Plant) and thus do not raise Fifth Amendment taking questions. See Landmarks Preservation Commission of the City of New York, Landmarks and Historic Districts (1977 and Jan. 10, 1978, Supplement). Although the Court refers to the New York ordinance as a *comprehensive* program to preserve *historic* landmarks, *ante,* at 107, the ordinance is not limited to historic buildings and gives little guidance to the Landmarks Preservation Commission in its selection of landmark sites. Section 207–1.0 (n) of the Landmarks Preservation Law, as set forth in N. Y. C. Admin. Code, ch. 8–A (1976), requires only that the selected landmark be at least 30 years old and possess "a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation."

planners for such a singular distinction. But he may well discover, as appellant Penn Central Transportation Co. did here, that the landmark designation imposes upon him a substantial cost, with little or no offsetting benefit except for the honor of the designation. The question in this case is whether the cost associated with the city of New York's desire to preserve a limited number of "landmarks" within its borders must be borne by all of its taxpayers or whether it can instead be imposed entirely on the owners of the individual properties.

Only in the most superficial sense of the word can this case be said to involve "zoning." [2] Typical zoning restrictions may, it is true, so limit the prospective uses of a piece of property as to diminish the value of that property in the abstract because it may not be used for the forbidden purposes. But any such abstract decrease in value will more than likely be at least partially offset by an increase in value which flows from similar restrictions as to use on neighboring

---

[2] Even the New York Court of Appeals conceded that "[t]his is not a zoning case. . . . Zoning restrictions operate to advance a comprehensive community plan for the common good. Each property owner in the zone is both benefited and restricted from exploitation, presumably without discrimination, except for permitted continuing nonconforming uses. The restrictions may be designed to maintain the general character of the area, or to assure orderly development, objectives inuring to the benefit of all, which property owners acting individually would find difficult or impossible to achieve . . . .

"Nor does this case involve landmark regulation of a historic district. . . . [In historic districting, as in traditional zoning,] owners although burdened by the restrictions also benefit, to some extent, from the furtherance of a general community plan.

.        .        .        .        .

"Restrictions on alteration of individual landmarks are not designed to further a general community plan. Landmark restrictions are designed to prevent alteration or demolition of a single piece of property. To this extent, such restrictions resemble 'discriminatory' zoning restrictions, properly condemned . . . ." 42 N. Y. 2d 324, 329–330, 366 N. E. 2d 1271, 1274 (1977).

properties. All property owners in a designated area are placed under the same restrictions, not only for the benefit of the municipality as a whole but also for the common benefit of one another. In the words of Mr. Justice Holmes, speaking for the Court in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922), there is "an average reciprocity of advantage."

Where a relatively few individual buildings, all separated from one another, are singled out and treated differently from surrounding buildings, no such reciprocity exists. The cost to the property owner which results from the imposition of restrictions applicable only to his property and not that of his neighbors may be substantial—in this case, several million dollars—with no comparable reciprocal benefits. And the cost associated with landmark legislation is likely to be of a completely different order of magnitude than that which results from the imposition of normal zoning restrictions. Unlike the regime affected by the latter, the landowner is not simply prohibited from using his property for certain purposes, while allowed to use it for all other purposes. Under the historic-landmark preservation scheme adopted by New York, the property owner is under an affirmative duty to *preserve* his property *as a landmark* at his own expense. To suggest that because traditional zoning results in some limitation of use of the property zoned, the New York City landmark preservation scheme should likewise be upheld, represents the ultimate in treating as alike things which are different. The rubric of "zoning" has not yet sufficed to avoid the well-established proposition that the Fifth Amendment bars the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960). See discussion *infra,* at 147–150.

In August 1967, Grand Central Terminal was designated a landmark over the objections of its owner Penn Central. Immediately upon this designation, Penn Central, like all

owners of a landmark site, was placed under an affirmative duty, backed by criminal fines and penalties, to keep "exterior portions" of the landmark "in good repair." Even more burdensome, however, were the strict limitations that were thereupon imposed on Penn Central's use of its property. At the time Grand Central was designated a landmark, Penn Central was in a precarious financial condition. In an effort to increase its sources of revenue, Penn Central had entered into a lease agreement with appellant UGP Properties, Inc., under which UGP would construct and operate a multistory office building cantilevered above the Terminal building. During the period of construction, UGP would pay Penn Central $1 million per year. Upon completion, UGP would rent the building for 50 years, with an option for another 25 years, at a guaranteed *minimum* rental of $3 million per year. The record is clear that the proposed office building was in full compliance with all New York zoning laws and height limitations. Under the Landmarks Preservation Law, however, appellants could not construct the proposed office building unless appellee Landmarks Preservation Commission issued either a "Certificate of No Exterior Effect" or a "Certificate of Appropriateness." Although appellants' architectural plan would have preserved the facade of the Terminal, the Landmarks Preservation Commission has refused to approve the construction.

## I

The Fifth Amendment provides in part: "nor shall private property be taken for public use, without just compensation." [3]

---

[3] The guarantee that private property shall not be taken for public use without just compensation is applicable to the States through the Fourteenth Amendment. Although the state "legislature may prescribe a form of procedure to be observed in the taking of private property for public use, . . . it is not due process of law if provision be not made for compensation." *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 236 (1897).

In a very literal sense, the actions of appellees violated this constitutional prohibition. Before the city of New York declared Grand Central Terminal to be a landmark, Penn Central could have used its "air rights" over the Terminal to build a multistory office building, at an apparent value of several million dollars per year. Today, the Terminal cannot be modified in *any* form, including the erection of additional stories, without the permission of the Landmark Preservation Commission, a permission which appellants, despite good-faith attempts, have so far been unable to obtain. Because the Taking Clause of the Fifth Amendment has not always been read literally, however, the constitutionality of appellees' actions requires a closer scrutiny of this Court's interpretation of the three key words in the Taking Clause—"property," "taken," and "just compensation." [4]

## A

Appellees do not dispute that valuable property rights have been destroyed. And the Court has frequently emphasized that the term "property" as used in the Taking Clause includes the entire "group of rights inhering in the citizen's [owner-ship]." *United States* v. *General Motors Corp.*, 323 U. S. 373 (1945). The term is not used in the

> "vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. [Instead, it] . . . denote[s] the *group of rights* inhering in the citizen's relation to the physical thing, *as*

---

[4] The Court's opinion touches base with, or at least attempts to touch base with, most of the major eminent domain cases decided by this Court. Its use of them, however, is anything but meticulous. In citing to *United States* v. *Caltex, Inc.*, 344 U. S. 149, 156 (1952), for example, *ante*, at 124, the only language remotely applicable to eminent domain is stated in terms of "the destruction of respondents' terminals by a trained team of engineers in the face of their impending seizure by the enemy." 344 U. S., at 156.

*the right to possess, use and dispose of it. . . .* The constitutional provision is addressed to *every sort of interest* the citizen may possess." *Id.,* at 377–378 (emphasis added).

While neighboring landowners are free to use their land and "air rights" in any way consistent with the broad boundaries of New York zoning, Penn Central, absent the permission of appellees, must forever maintain its property in its present state.[5] The property has been thus subjected to a nonconsensual servitude not borne by any neighboring or similar properties.[6]

## B

Appellees have thus destroyed—in a literal sense, "taken"— substantial property rights of Penn Central. While the term "taken" might have been narrowly interpreted to include only physical seizures of property rights, "the construction of the phrase has not been so narrow. The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking." *Id.,* at 378. See also *United States* v. *Lynah,* 188 U. S. 445, 469

---

[5] In particular, Penn Central cannot increase the height of the Terminal. This Court has previously held that the "air rights" over an area of land are "property" for purposes of the Fifth Amendment. See *United States* v. *Causby,* 328 U. S. 256 (1946) ("air rights" taken by low-flying airplanes); *Griggs* v. *Allegheny County,* 369 U. S. 84 (1962) (same); *Portsmouth Harbor Land & Hotel Co.* v. *United States,* 260 U. S. 327 (1922) (firing of projectiles over summer resort can constitute taking). See also *Butler* v. *Frontier Telephone Co.,* 186 N. Y. 486, 79 N. E. 716 (1906) (stringing of telephone wire across property constitutes a taking).

[6] It is, of course, irrelevant that appellees interfered with or destroyed property rights that Penn Central had not yet physically used. The Fifth Amendment must be applied with "reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, *or such as may be reasonably expected in the immediate future." Boom Co.* v. *Patterson,* 98 U. S. 403, 408 (1879) (emphasis added).

(1903); [7] *Dugan* v. *Rank,* 372 U. S. 609, 625 (1963). Because "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense," *Armstrong* v. *United States,* 364 U. S., at 48, however, this does not end our inquiry. But an examination of the two exceptions where the destruction of property does *not* constitute a taking demonstrates that a compensable taking has occurred here.

1

As early as 1887, the Court recognized that the government can prevent a property owner from using his property to injure others without having to compensate the owner for the value of the forbidden use.

"A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be *injurious to the health, morals, or safety of the community,* cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the State that its use by any one, for certain forbidden purposes, is prejudicial to the public interests. . . . The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, *by reason of their not being permitted, by a noxious use of*

---

[7] "Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors." 188 U. S., at 470.

> their property, to inflict injury upon the community."
> *Mugler* v. *Kansas,* 123 U. S. 623, 668–669.

Thus, there is no "taking" where a city prohibits the operation of a brickyard within a residential area, see *Hadacheck* v. *Sebastian,* 239 U. S. 394 (1915), or forbids excavation for sand and gravel below the water line, see *Goldblatt* v. *Hempstead,* 369 U. S. 590 (1962). Nor is it relevant, where the government is merely prohibiting a noxious use of property, that the government would seem to be singling out a particular property owner. *Hadacheck, supra,* at 413.[8]

The nuisance exception to the taking guarantee is not coterminous with the police power itself. The question is whether the forbidden use is dangerous to the safety, health, or welfare of others. Thus, in *Curtin* v. *Benson,* 222 U. S. 78 (1911), the Court held that the Government, in prohibiting the owner of property within the boundaries of Yosemite National Park from grazing cattle on his property, had taken the owner's property. The Court assumed that the Government could constitutionally require the owner to fence his land or take other action to prevent his cattle from straying onto others' land without compensating him.

> "Such laws might be considered as strictly regulations of the use of property, of so using it that no injury could result to others. They would have the effect of making the owner of land herd his cattle on his own land and of making him responsible for a neglect of it." *Id.,* at 86.

The prohibition in question, however, was "not a prevention of a misuse or illegal use but the prevention of a legal and essential use, an attribute of its ownership." *Ibid.*

Appellees are not prohibiting a nuisance. The record is

---

[8] Each of the cases cited by the Court for the proposition that legislation which severely affects some landowners but not others does not effect a "taking" involved noxious uses of property. See *Hadacheck; Miller* v. *Schoene,* 276 U. S. 272 (1928); *Goldblatt.* See *ante,* at 125–127, 133.

clear that the proposed addition to the Grand Central Terminal would be in full compliance with zoning, height limitations, and other health and safety requirements. Instead, appellees are seeking to preserve what they believe to be an outstanding example of beaux arts architecture. Penn Central is prevented from further developing its property basically because *too good* a job was done in designing and building it. The city of New York, because of its unadorned admiration for the design, has decided that the owners of the building must preserve it unchanged for the benefit of sightseeing New Yorkers and tourists.

Unlike land-use regulations, appellees' actions do not merely *prohibit* Penn Central from using its property in a narrow set of noxious ways. Instead, appellees have placed an *affirmative* duty on Penn Central to maintain the Terminal in its present state and in "good repair." Appellants are not free to use their property as they see fit within broad outer boundaries but must strictly adhere to their past use except where appellees conclude that alternative uses would not detract from the landmark. While Penn Central may continue to use the Terminal as it is presently designed, appellees otherwise "exercise complete dominion and control over the surface of the land," *United States* v. *Causby,* 328 U. S. 256, 262 (1946), and must compensate the owner for his loss. *Ibid.* "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired." *United States* v. *Dickinson,* 331 U. S. 745, 748 (1947). See also *Dugan* v. *Rank, supra,* at 625.[9]

---

[9] In *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312 (1893), the Monangahela company had expended large sums of money in improving the Monongahela River by means of locks and dams. When the United States condemned this property for its own use, the Court held that full compensation had to be awarded. "Suppose, in the improvement of a navigable stream, it was deemed essential to construct a canal with locks, in order to pass around rapids or falls. Of the power of Congress

## 2

Even where the government prohibits a noninjurious use, the Court has ruled that a taking does not take place if the prohibition applies over a broad cross section of land and thereby "secure[s] an average reciprocity of advantage." *Pennsylvania Coal Co*. v. *Mahon*, 260 U. S., at 415.[10] It is for this reason that zoning does not constitute a "taking." While zoning at times reduces *individual* property values, the burden is shared relatively evenly and it is reasonable to conclude that on the whole an individual who is harmed by one aspect of the zoning will be benefited by another.

Here, however, a multimillion dollar loss has been imposed on appellants; it is uniquely felt and is not offset by any benefits flowing from the preservation of some 400 other "landmarks" in New York City. Appellees have imposed a substantial cost on less than one one-tenth of one percent of the buildings in New York City for the general benefit of all its people. It is exactly this imposition of general costs on a few individuals at which the "taking" protection is directed. The Fifth Amendment

"prevents the public from loading upon one individual more than his just share of the burdens of government,

---

to condemn whatever land may be necessary for such canal, there can be no question; and of the equal necessity of paying full compensation for all private property taken there can be as little doubt." *Id.*, at 337. Under the Court's rationale, however, where the Government wishes to preserve a pre-existing canal system for public use, it need not condemn the property but need merely order that it be preserved in its present form and be kept "in good repair."

[10] Appellants concede that the preservation of buildings of historical or aesthetic importance is a permissible objective of state action. Brief for Appellants 12. Cf. *Berman* v. *Parker*, 348 U. S. 26 (1954); *United States* v. *Gettysburg Electric R. Co.*, 160 U. S. 668 (1896).

For the reasons noted in the text, historic *zoning*, as has been undertaken by cities such as New Orleans, may well not require compensation under the Fifth Amendment.

and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him." *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 325 (1893).

Less than 20 years ago, this Court reiterated that the

"Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States,* 364 U. S., at 49.

Cf. *Nashville, C. & St. L. R. Co.* v. *Walters,* 294 U. S. 405, 428–430 (1935).[11]

As Mr. Justice Holmes pointed out in *Pennsylvania Coal Co.* v. *Mahon,* "the question at bottom" in an eminent domain case "is upon whom the loss of the changes desired should fall." 260 U. S., at 416. The benefits that appellees believe will flow from preservation of the Grand Central Terminal will accrue to all the citizens of New York City. There is no reason to believe that appellants will enjoy a substantially greater share of these benefits. If the cost of preserving Grand Central Terminal were spread evenly across the entire population of the city of New York, the burden per person would be in cents per year—a minor cost appellees would

---

[11] "It is true that the police power embraces regulations designed to promote public convenience or the general welfare, and not merely those in the interest of public health, safety and morals. . . . But when particular individuals are singled out to bear the cost of advancing the public convenience, that imposition must bear some reasonable relation to the evils to be eradicated or the advantages to be secured. . . . While moneys raised by general taxation may constitutionally be applied to purposes from which the individual taxed may receive no benefit, and indeed, suffer serious detriment, . . . so-called assessments for public improvements laid upon particular property owners are ordinarily constitutional only if based on benefits received by them." 294 U. S., at 429–430.

surely concede for the benefit accrued. Instead, however, appellees would impose the entire cost of several million dollars per year on Penn Central. But it is precisely this sort of discrimination that the Fifth Amendment prohibits.[12]

Appellees in response would argue that a taking only occurs where a property owner is denied *all* reasonable value of his property.[13] The Court has frequently held that, even where a destruction of property rights would not *otherwise* constitute a taking, the inability of the owner to make a reasonable return on his property requires compensation under the Fifth Amendment. See, *e. g., United States* v. *Lynah,* 188 U. S., at 470. But the converse is not true. A taking does not become a noncompensable exercise of police power simply because the government in its grace allows the owner to make some "reasonable" use of his property. "[I]t is the character of the invasion, not the amount of damage resulting from it,

---

[12] The fact that the Landmarks Preservation Commission may have allowed additions to a relatively few landmarks is of no comfort to appellants. *Ante,* at 118 n. 18. Nor is it of any comfort that the Commission refuses to allow appellants to construct any additional stories because of their belief that such construction would not be aesthetic. *Ante,* at 117–118.

[13] Difficult conceptual and legal problems are posed by a rule that a taking only occurs where the property owner is denied all reasonable return on his property. Not only must the Court define "reasonable return" for a variety of types of property (farmlands, residential properties, commercial and industrial areas), but the Court must define the particular property unit that should be examined. For example, in this case, if appellees are viewed as having restricted Penn Central's use of its "air rights," *all* return has been denied. See *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922). The Court does little to resolve these questions in its opinion. Thus, at one point, the Court implies that the question is whether the restrictions have "an unduly harsh impact upon the owner's use of the property," *ante,* at 127; at another point, the question is phrased as whether Penn Central can obtain "a 'reasonable return' on its investment," *ante,* at 136; and, at yet another point, the question becomes whether the landmark is "economically viable," *ante,* at 138 n. 36.

so long as the damage is substantial, that determines the question whether it is a taking." *United States* v. *Cress,* 243 U. S. 316, 328 (1917); *United States* v. *Causby,* 328 U. S., at 266. See also *Goldblatt* v. *Hempstead,* 369 U. S., at 594.

## C

Appellees, apparently recognizing that the constraints imposed on a landmark site constitute a taking for Fifth Amendment purposes, do not leave the property owner empty-handed. As the Court notes, *ante,* at 113–114, the property owner may theoretically "transfer" his previous right to develop the landmark property to adjacent properties if they are under his control. Appellees have coined this system "Transfer Development Rights," or TDR's.

Of all the terms used in the Taking Clause, "just compensation" has the strictest meaning. The Fifth Amendment does not allow simply an approximate compensation but requires "a full and perfect equivalent for the property taken." *Monongahela Navigation Co.* v. *United States,* 148 U. S., at 326.

> "[I]f the adjective 'just' had been omitted, and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective 'just.' There can, in view of the combination of those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken." *Ibid.*

See also *United States* v. *Lynah, supra,* at 465; *United States* v. *Pewee Coal Co.,* 341 U. S. 114, 117 (1951). And the determination of whether a "full and perfect equivalent" has been awarded is a "judicial function." *United States* v. *New River Collieries Co.,* 262 U. S. 341, 343–344 (1923). The fact

that *appellees* may believe that TDR's provide full compensation is irrelevant.

> "The legislature may determine what private property is needed for public purposes—that is a question of a political and legislative character; but when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry." *Monongahela Navigation Co.* v. *United States, supra,* at 327.

Appellees contend that, even if they have "taken" appellants' property, TDR's constitute "just compensation." Appellants, of course, argue that TDR's are highly imperfect compensation. Because the lower courts held that there was no "taking," they did not have to reach the question of whether or not just compensation has already been awarded. The New York Court of Appeals' discussion of TDR's gives some support to appellants:

> "The many defects in New York City's program for development rights transfers have been detailed elsewhere . . . . The area to which transfer is permitted is severely limited [and] complex procedures are required to obtain a transfer permit." 42 N. Y. 2d 324, 334–335, 366 N. E. 2d 1271, 1277 (1977).

And in other cases the Court of Appeals has noted that TDR's have an "uncertain and contingent market value" and do "not adequately preserve" the value lost when a building is declared to be a landmark. *French Investing Co.* v. *City of New York,* 39 N. Y. 2d 587, 591, 350 N. E. 2d 381, 383, appeal dismissed, 429 U. S. 990 (1976). On the other hand, there is evidence in the record that Penn Central has been

offered substantial amounts for its TDR's. Because the record on appeal is relatively slim, I would remand to the Court of Appeals for a determination of whether TDR's constitute a "full and perfect equivalent for the property taken." [14]

## II

Over 50 years ago, Mr. Justice Holmes, speaking for the Court, warned that the courts were "in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S., at 416. The Court's opinion in this case demonstrates that the danger thus foreseen has not abated. The city of New York is in a precarious financial state, and some may believe that the costs of landmark preservation will be more easily borne by corporations such as Penn Central than the overburdened individual tax-

---

[14] The Court suggests, *ante,* at 131, that if appellees are held to have "taken" property rights of landmark owners, not only the New York City Landmarks Preservation Law, but "all comparable landmark legislation in the Nation," must fall. This assumes, of course, that TDR's are not "just compensation" for the property rights destroyed. It also ignores the fact that many States and cities in the Nation have chosen to preserve landmarks by purchasing or condemning restrictive easements over the facades of the landmarks and are apparently quite satisfied with the results. See, *e. g.,* Ore. Rev. Stat. §§ 271.710, 271.720 (1977); Md. Ann. Code, Art 41, § 181A (1978); Va. Code §§ 10–145.1 and 10–138 (e) (1978); Richmond, Va., City Code § 17–23 *et seq.* (1975). The British National Trust has effectively used restrictive easements to preserve landmarks since 1937. See National Trust Act, 1937, 1 Edw. 8 and 1 Geo. 6 ch. lvii, §§ 4 and 8. Other States and cities have found that tax incentives are also an effective means of encouraging the private preservation of landmark sites. See, *e. g.,* Conn. Gen. Stat. § 12–127a (1977); Ill. Rev. Stat., ch. 24, § 11–48.2–6 (1976); Va. Code § 10–139 (1978). The New York City Landmarks Preservation Law departs drastically from these traditional, and constitutional, means of preserving landmarks.

payers of New York. But these concerns do not allow us to ignore past precedents construing the Eminent Domain Clause to the end that the desire to improve the public condition is,·indeed, achieved by a shorter cut than the constitutional way of paying for the change.