THE STATE EX REL. SHELLY MATERIALS, INC., APPELLANT, *v.*
CLARK COUNTY BOARD OF COMMISSIONERS, APPELLEE.

[Cite as *State ex rel. Shelly Materials, Inc. v. Clark Cty. Bd. of Commrs.*, 115 Ohio St.3d 337, 2007-Ohio-5022.]

(No. 2006–0165—Submitted April 17, 2007—Decided October 3, 2007.)

———————

———————

LANZINGER, J.

{¶ 1} This is an appeal from a judgment denying a writ of mandamus to compel appellee, the Clark County Board of Commissioners ("commissioners"), to begin appropriation proceedings. Appellant, Shelly Materials, Inc. ("Shelly"), claims that the county zoning appeals board's denial of a conditional-use permit to mine sand and gravel on a parcel of land it purchased in Moorefield Township, Clark County, constitutes a compensable regulatory taking. We hold that the court of appeals concluded correctly that the denial of Shelly's conditional-use-permit application did not constitute a compensable categorical taking of property. Accordingly, we affirm the judgment denying the writ of mandamus.

### Case Background

{¶ 2} Shelly has been in the business of sand and gravel extraction, aggregate production, and construction in Clark County for 35 years. In 1998, the company purchased a 306.057–acre tract of land in Moorefield Township for $1,943,340, to mine the sand and gravel deposits beneath the surface.

{¶ 3} The purchased property, zoned A–1 as an agricultural district, permits agricultural uses and also allows residences on lots of one acre or more. The parcel is surrounded by eight subdivisions with more than 200 residential lots. Resource and mineral extraction is an allowed conditional use in an A–1 Agricultural District, provided that the Clark County Board of Zoning Appeals approves the application for a permit as a conditional use.

{¶ 4} The year after it bought the property, Shelly submitted its application to the board for a conditional-use permit. Following community hearings, Shelly filed an amended application, seeking a permit to mine sand and gravel for 20 years, with a gradual conversion of the property into an area suitable for development as a lakefront residential community. After consideration of the amended application, the board denied Shelly's application because the company had not complied with certain zoning regulations. More specifically, the board concluded:

{¶ 5} "4. The Applicant has not complied with Section 129(4) of the Clark County Zoning Resolution, because the Applicant has not demonstrated that the proposed resource and mineral extraction use would not be detrimental to the vicinity or surrounding properties.

{¶ 6} "5. The Applicant has not complied with Section 129(5) of the Clark County Zoning Resolution, because the Applicant has not demonstrated that all equipment used in the proposed resource and mineral extraction use would be constructed, maintained, and operated in such a manner as to eliminate so far as practical, noise, vibration, or dust which would injure or annoy persons living in the vicinity.

{¶ 7} " * * *

{¶ 8} "12. The Applicant has not complied with Section 129(12) of the Clark County Zoning Resolution, because the Applicant has not demonstrated that the proposed resource and mineral extraction use would be carried out in a manner and on such scale as to minimize dust, noise, and vibrations, and to prevent adversely affecting the surrounding properties.

{¶ 9} "13. The Applicant has not complied with Section 129(13) of the Clark County Zoning Resolution, because the Applicant has not demonstrated that access roads to the proposed use would be maintained in a dust-free condition."

{¶ 10} The Clark County Court of Common Pleas affirmed the board's denial of the conditional-use permit.

{¶ 11} Shelly appealed. The Second District Court of Appeals determined that the findings that Shelly had violated Clark County Zoning Resolution 129(5), (12), and (13) were not supported by evidence. *Shelly Materials, Inc. v. Daniels*, Clark App. No. 2002–CA–13, 2003-Ohio-51, 2003 WL 77176, ¶ 44, 48, 51. The court of appeals concluded that there was no credible evidence that substantiated any concerns "about dust, noise, groundwater contamination, and traffic." Id. at ¶ 82. Yet the court affirmed the judgment of the trial court because sufficient evidence backed the board's finding that Shelly did not demonstrate that its operations "will not be detrimental to the vicinity or surrounding properties," Clark County Zoning Resolution Section 129(4). Id. at ¶ 82. The court of appeals stated, "[W]hile the evidence is far from overwhelming, we have to conclude * * * that the trial court did not err in finding the proposed gravel pit incompatible with the surrounding area." Id. at ¶ 84. The Second District rejected Shelly's constitutional arguments against the board's decision and interpretation of the zoning regulations. Id. at ¶ 113. We did not accept for review Shelly's discretionary appeal from the court of appeals' judgment. *Shelly Materials, Inc. v. Daniels*, 99 Ohio St.3d 1410, 2003-Ohio-2454, 788 N.E.2d 647.

## Federal Case

{¶ 12} Shelly sued the board and the county zoning inspector in federal district court alleging Fifth and Fourteenth Amendment claims under Section 1983, Title 42, U.S.Code. Shelly sought declaratory and injunctive relief and damages, alleging that the board's denial of its conditional-use-permit application was an unconstitutional taking, that the zoning regulations were unconstitutional both on their face and as applied, and that it was denied both substantive and procedural due process and equal protection of the law.

{¶ 13} The district court dismissed the taking claim and state constitutional claims without prejudice because Shelly had not exhausted its state remedies. The court also held that the due process claims were barred by res judicata and that the equal protection claim lacked merit. The United States Court of

Appeals for the Sixth Circuit affirmed the dismissal of the taking claim but deferred consideration of the remaining claims, removing the appeal from the active docket, subject to a possible reinstatement after state court proceedings were completed.

## Mandamus Case

{¶ 14} Shelly then filed a complaint in the Second District Court of Appeals for a writ of mandamus to compel the commissioners to begin appropriation proceedings, alleging that the permit denial was a compensable and involuntary taking. The commissioners filed an answer, and both parties filed motions for summary judgment. The court of appeals granted the commissioners' motion for summary judgment, denied Shelly's motion for summary judgment, and denied the writ. *State ex rel. Shelly Materials, Inc. v. Clark Cty. Bd. of Commrs.*, Clark App. No. 2003–CA–72, 2005-Ohio-6682, 2005 WL 3454751.

{¶ 15} This matter is now before us as an appeal as of right. To be entitled to a writ of mandamus, Shelly must establish a clear legal right to compel the commissioners to begin appropriation, the commissioners' corresponding clear legal duty to institute such action, and the lack of an adequate remedy for Shelly in the ordinary course of law. See *State ex rel. Duncan v. Mentor City Council,* 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 10. Mandamus is the appropriate action to compel public authorities to commence appropriation cases when an involuntary taking of private property is alleged. *State ex rel. Preschool Dev., Ltd. v. Springboro,* 99 Ohio St.3d 347, 2003-Ohio-3999, 792 N.E.2d 721, ¶ 12.

## The Takings Clause and Regulatory Takings

{¶ 16} Often referred to as the Just Compensation Clause, the final clause of the Fifth Amendment to the United States Constitution provides: "nor shall private property be taken for public use, without just compensation." This prohibition applies to the states as well as the federal government. *Chicago, Burlington & Quincy R.R. Co. v. Chicago* (1897), 166 U.S. 226, 239, 241, 17 S.Ct. 581, 41 L.Ed. 979; *Webb's Fabulous Pharmacies, Inc. v. Beckwith* (1980), 449 U.S. 155, 160, 101 S.Ct. 446, 66 L.Ed.2d 358. Section 19, Article I of the Ohio Constitution also provides that private property shall not be taken for public use without just compensation. See, also, *State ex rel. Trafalgar Corp. v. Miami Cty. Bd. of Commrs.,* 104 Ohio St.3d 350, 2004-Ohio-6406, 819 N.E.2d 1040, ¶ 24.

{¶ 17} The government's appropriation or physical invasion of private property requires compensation for the property owner. We recently have indicated the limits on the government power in eminent domain. *Norwood v. Horney,* 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115. In some instances, moreover, a direct appropriation or ouster does not occur, but government regulation of private property becomes so onerous that its effect is tantamount to a condemna-

tion, and such regulatory taking may be compensable under the Fifth Amendment. See *Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (property may be regulated to a certain extent, but "if regulation goes too far it will be recognized as a taking").

{¶ 18} Two types of regulatory actions will be deemed to be per se takings for Fifth Amendment purposes: first, those government actions that cause an owner to suffer a permanent physical invasion of property, see *Loretto v. Teleprompter Manhattan CATV Corp.* (1982), 458 U.S. 419, 435–440, 102 S.Ct. 3164, 73 L.Ed.2d 868 (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking); and second, government regulations that completely deprive an owner of "*all* economically beneficial uses" of the property. (Emphasis sic.) *Lucas v. South Carolina Coastal Council* (1992), 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798. A *Lucas* taking is also known as a categorical, or total, taking, and in such a case, the government must pay just compensation for the total property taken except to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the property. Id. at 1030, 112 S.Ct. 2886, 120 L.Ed.2d 798. " 'Outside these two relatively narrow categories (and the special context of land-use exactions [1] * * *), regulatory takings challenges are governed by the standards set forth in *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).' " *Lingle v. Chevron U.S.A., Inc.* (2005), 544 U.S. 528, 538, 125 S.Ct. 2074, 161 L.Ed.2d 876.

{¶ 19} The default standard of *Penn Cent.* with respect to "partial" regulatory taking demands an analysis different from the analysis for a total taking, because after the partial regulatory taking, the remaining property still has value. *Penn Cent.*, 438 U.S. at 129, 98 S.Ct. 2646, 57 L.Ed.2d 631. *Penn Cent.* recognizes an ad hoc, factual inquiry that requires the examination of the following three factors to determine whether a regulatory taking occurred in cases in which there is no physical invasion and the regulation deprives the property of less than 100 percent of its economically viable use: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. Id. at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631.

{¶ 20} Both the United States Supreme Court and this court have recognized that the denial of a permit allowing a certain use of property may constitute a taking if the effect of the denial is to prevent all economically viable use of the land. In *United States v. Riverside Bayview Homes, Inc.* (1985), 474 U.S. 121,

1. Land-use exactions are government demands that a landowner dedicate an easement allowing public access to property as a condition of obtaining a development permit. *Lingle v. Chevron U.S.A., Inc.* (2005), 544 U.S. 528, 546, 125 S.Ct. 2074, 161 L.Ed.2d 876.

127, 106 S.Ct. 455, 88 L.Ed.2d 419, in which denial of a permit to dump fill material in wetlands was deemed not to be a taking, the court stated, "A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred."

{¶ 21} Correspondingly, in a case in which denial of a demolition permit was deemed not to be a taking, we observed that " 'in order for the landowner to prove a [regulatory] taking, he or she must prove that the application of the ordinance has infringed upon the landowner's rights to the point that there is no economically viable use of the land and, consequently, a taking has occurred for which he or she is entitled to compensation.' " *State ex rel. BSW Dev. Group v. Dayton* (1998), 83 Ohio St.3d 338, 343, 699 N.E.2d 1271, quoting *Goldberg Cos., Inc. v. Richmond Hts. City Council* (1998), 81 Ohio St.3d 207, 210, 690 N.E.2d 510.

{¶ 22} Shelly has asserted that it has been subjected to a categorical, or total, taking. A total taking occurs when the denial of a property owner's application for a conditional-use permit denies the owner all economically viable use of its property. "In the *Lucas* context, of course, the complete elimination of a property's value. is the determinative factor." *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074, 161 L.Ed.2d 876.

{¶ 23} The Second District Court of Appeals determined that Shelly's claim was governed by *Community Concerned Citizens, Inc. v. Union Twp. Bd. of Zoning Appeals* (1993), 66 Ohio St.3d 452, 613 N.E.2d 580. In *Community Concerned Citizens,* the claimant had purchased property, knowing that it was zoned "residential, single family" and that a day care center was a conditional use. We held that the township's refusal to grant the application for a conditional use was not a taking, and the fact that a day care center could not be constructed and operated did not deny the owner all economically beneficial uses of the land. Id. at 458, 613 N.E.2d 580.

{¶ 24} Here, the Second District concluded that Shelly had purchased the property with knowledge that a conditional-use permit was required to mine the sand and gravel in the zoned area. When the permit application was denied, not all economically beneficial use of Shelly's property was lost, and therefore, no compensable taking occurred. *Shelly Materials,* 2005-Ohio-6682, 2005 WL 3454751, ¶ 14. Because the purchased parcel had many potential uses, no

genuine issue of material fact existed that Shelly had not been deprived of all economically viable use of its land. Id. at ¶ 22.

## Applicability of *R.T.G.*

{¶ 25} Shelly contends that *State ex rel. R.T.G., Inc. v. State,* 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998, requires reversal of the judgment of the court of appeals and a remand for the writ of mandamus to issue.

{¶ 26} *R.T.G.* is a plurality opinion of this court that departs from the established doctrine of considering a "parcel as a whole" in analyzing a regulatory-taking claim. The United States Supreme Court has generally rejected attempts to sever property interests in determining the relevant parcel for regulatory taking under the Fifth Amendment. See *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002), 535 U.S. 302, 331, 122 S.Ct. 1465, 152 L.Ed.2d 517.

{¶ 27} No party in this case has requested that *R.T.G.* be overruled or has cited the rule in *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, that must be applied before precedent is discarded. "A prior decision of the Supreme Court may be overruled where (1) the decision was wrongly decided at that time, or changes in circumstances no longer justify continued adherence to the decision, (2) the decision defies practical workability, and (3) abandoning the precedent would not create an undue hardship for those who have relied upon it." Id., paragraph one of the syllabus.

{¶ 28} That is not to say that *R.T.G.* should not be limited to its facts, although the syllabus is stated broadly. "In determining the relevant parcel for a takings analysis, pursuant to the Takings Clause of the Ohio Constitution, Section 19, Article I, coal rights are severable and may be considered as a separate property interest if the property owner's intent was to purchase the property solely for the purpose of mining the coal." *R.T.G.,* 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998.

{¶ 29} *R.T.G.*'s holding, however, was largely dependent on unique circumstances. R.T.G. was a coal-mining company that had purchased land and coal leases in eastern Ohio. Id. at ¶ 2. Because a majority of the property had been leased for its coal rights, a separate mineral estate was created for the greater portion of R.T.G.'s land. Id. at ¶ 49. The Ohio Reclamation Board of Review applied an "unsuitable for mining" ("UFM") designation to acreage that included much of R.T.G.'s property containing coal, because the reclamation agency was concerned that mining would pollute the only available water source of a local village. Id. at ¶ 2. When the UFM designation was applied, R.T.G. already had received conditional-use permits for some of its acreage and had been surface mining the coal in the area for ten years. Id. at ¶ 11. R.T.G. claimed that by

prohibiting its mining operations, the government had effected a compensable *Lucas* "total taking" of all the property R.T.G. had acquired, both as to the fee-owned land and the land leased for mineral rights. Id. at ¶ 44.

{¶ 30} Rather than distinguish between the land owned in fee and the land leased, as did the court of appeals on review, the *R.T.G.* plurality held that the "coal rights" were the relevant parcel and then decided that all economically beneficial use had been taken. Id. at ¶ 57. Stating that "mineral rights are recognized by Ohio law as separate property rights," id. at ¶ 49, the court cited *Moore v. Indian Camp Coal Co.* (1907), 75 Ohio St. 493, 80 N.E. 6.

{¶ 31} *Moore*, however, should be read in context. *Moore* begins, "This court has several times recognized and applied the doctrine that there *may be* a complete severance of the ownership of the surface of land from the ownership of the different strata of mineral which may underlie the surface; and that *the creation of a separate interest in the mineral with the right to remove the same, whether by deed, grant, lease, reservation or exception, unless expressly restricted, confers upon the owner of the mineral a fee simple* estate, which is of course determinable upon the exhaustion of the mine." (Emphasis added.) Id. at 499, 80 N.E. 6.

{¶ 32} Thus, *Moore* acknowledged that mineral rights "may" be recognized separately; however, these rights are created as a separate interest in the land, whether "by deed, grant, lease, reservation or exception." In *R.T.G.*, a separate mineral estate had been created in at least a portion of the land held by the property owner. In contrast, there is no dispute that Shelly purchased its land in its entirety and that the deed transferred a fee simple title to Shelly.

{¶ 33} *R.T.G.* stated that the UFM designation constituted a *Lucas* total taking of R.T.G.'s coal property, even though arguably the designation did not deprive R.T.G. of all economically beneficial use of the property it owned in fee. Shelly now asks us to expand *R.T.G.* and hold that if a property is purchased only to mine sand and gravel, the owner who does not receive a conditional-use permit must receive compensation for a total taking of the value of the mining. We decline to broaden *R.T.G.* in this fashion.

{¶ 34} Sand and gravel are minerals that are subject to mining restrictions. R.C. 1514.01(B); see, also, R.C. 5301.56(A)(4), which includes sand and gravel in the definition of "minerals" in an Ohio Marketable Title Act provision concerning abandonment and preservation of mineral interests. *R.T.G.* should be clarified based upon *Moore*'s holding: A mineral estate may be considered the relevant parcel for a compensable regulatory taking if the mineral estate was purchased separately from the other interests in the real property. Otherwise, the property should be considered as a whole when a regulatory-taking claim is made. Because there is no evidence that a mineral estate was created in this case, the

court of appeals correctly examined Shelly's purchased property as the relevant parcel.

{¶ 35} The Second District appropriately examined the parcel as a whole, including its surface rights, in determining whether a taking had occurred. *Shelly Materials,* 2005-Ohio-6682, 2005 WL 3454751, ¶ 22. Although the court emphasized that Shelly purchased the property with notice of the zoning regulations, we note that the United States Supreme Court has stated that this chronology is not necessarily a bar to a taking claim. *Palazzolo v. Rhode Island* (2001), 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592. Nevertheless, a property owner's awareness of regulations may be relevant in a *Penn Cent.* partial taking, for one of the inquiries is " 'the extent to which the regulation has interfered with distinct investment-backed expectations.' " *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074, 161 L.Ed.2d 876, quoting *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631. Shelly, however, has not made a *Penn Cent.* taking claim here.

## Background Principles

{¶ 36} "[E]ven if a regulation results in categorical taking, no compensation is due if the claimant's use of the land violates 'restrictions that background principles of the State's law of property and nuisance already place upon land ownership.' " *R.T.G.,* 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998, ¶ 36, quoting *Lucas,* 505 U.S. at 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798. There is no need to examine background principles in this case, because there has been no categorical taking.

## The Regulatory Burden

{¶ 37} Shelly also argues that (1) application of Chapter 7, Section 129(4) of the Clark County Zoning Resolution to deny Shelly its use of the sand and gravel within its property "imposes a burden so onerous and extreme that compensation should be paid," and (2) the burden imposed upon a natural-resource owner who is denied a conditional-use permit to extract the natural resources "is greater than the burden imposed upon other types of landowners such that a protectable property interest should be found." In other words, Shelly maintains that advance notice of a conditional-use regulatory scheme should not divest owners of property containing natural resources of their property interests without just compensation.

{¶ 38} The United States Supreme Court has explained that the purpose of the Takings Clause is to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States* (1960), 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554. The question is whether Shelly's situation demands a writ of

mandamus to order the commissioners to begin appropriation proceedings because it has not been granted the conditional-use permit.

{¶ 39} Shelly contends that denial of the conditional-use permit removes all economic value associated with its property. However, Shelly purchased more than sand and gravel rights, and as we have discussed, there are other potential uses available for that land. The Clark County Board of Zoning has authority to regulate property and issue conditional-use permits within the county. The court of appeals has upheld the permit denial.

{¶ 40} Whether mining natural resources should be treated differently from other conditionally permitted uses is a public policy question that we decline to answer. Under the circumstances of this case, we hold that there has been no undue burden placed on Shelly by the denial of its conditional-use permit.

### Conclusion

{¶ 41} Based on the foregoing, Shelly's sand and gravel interests in its property are not severable as separate property interests because the deed did not specify a transfer of mineral rights alone, but transferred fee simple title to Shelly. Therefore, any regulatory taking claim must be analyzed using the property as a whole. Because the county zoning appeals board's denial of the conditional-use permit did not deprive Shelly of all economically viable use of its property, a compensable taking did not occur.

{¶ 42} Accordingly, we affirm the judgment of the court of appeals and deny the writ.

Judgment affirmed.

MOYER, C.J., and O'CONNOR and CUPP, JJ., concur.

O'DONNELL, J., concurs in judgment only.

PFEIFER and LUNDBERG STRATTON, JJ., dissent.

---

**PFEIFER, J., dissenting.**

{¶ 43} I dissent from the majority opinion, which muddles takings law in Ohio by ignoring precedent. This case is in all relevant regards identical to *State ex rel. R.T.G., Inc. v. State*, 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998. However, in direct contradiction to *R.T.G.*, the majority concludes here that "Shelly's sand and gravel interests in its property are not severable as separate property interests because the deed did not specify a transfer of mineral rights alone, but transferred fee simple title to Shelly," holding that this conclusion is supported by a "limitation" on our previous holding in *R.T.G.*

{¶ 44} The court's holding is erroneous for several reasons: (1) it actually overrules *R.T.G.* instead of limiting it, (2) it makes arbitrary distinctions between the facts in *R.T.G.* and the facts of this case, and (3) it relies on a ground that was neither argued by the parties nor adopted by the court of appeals. Moreover, even if the court's sua sponte limitation of *R.T.G.* is appropriate, a reversal and remand are warranted so that Shelly is afforded the opportunity to raise a *Penn Cent.* taking claim. *Penn Cent. v. New York City* (1978), 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631.

{¶ 45} First, the court's holding—that a mineral estate may be considered the relevant parcel for a regulatory-taking determination only if the mineral estate was purchased separately from other interests in the real property—actually overrules *R.T.G.* rather than limiting or clarifying it. In *R.T.G.*, 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998, syllabus, and ¶ 49–50, the court held that regardless of whether a mineral-extracting company purchases property in fee simple or through mineral-rights leases or purchases, as long as the company does so for the sole purpose of mining the minerals from the property, the mineral estate is severable from the remainder of the property owned in fee, and the relevant parcel for a takings analysis is the severed mineral estate.

{¶ 46} *R.T.G.* did not require that the deed to the property transferred to a mineral-extracting company "specify a transfer of mineral rights alone" in lieu of a fee interest. Instead, the court specifically held that "RTG acquired all the property at issue herein, *whether in fee or through coal leases or purchases,* for the sole purpose of surface-mining the coal * * *" and that all of that mineral estate was the relevant parcel for a takings analysis. (Emphasis added.) *R.T.G.* at ¶ 50.

{¶ 47} In effect, the majority opinion adopts the holding of the court of appeals in *R.T.G.*, which distinguished between owning mineral rights separately and owning those rights as part of the property purchased in fee. *R.T.G.* at ¶ 19–23. But in *R.T.G.*, we *reversed* the portion of the court of appeals' judgment that did not sever the mineral estate from the property owned by R.T.G. in fee:

{¶ 48} "We reverse the judgment of the court of appeals in part and hold that the UFM [unsuitable for mining] regulation resulted in a taking of RTG's coal that lies under the tracts of land in which RTG owned only coal rights and that are located within the UFM-designated area, *as well as the coal rights that lie under the tracts of land that RTG owned in fee* and that are located in the UFM-designated area." (Emphasis added.) Id. at ¶ 3.

{¶ 49} Therefore, the so-called "limitation" or "clarification" of *R.T.G.* espoused by the majority manifestly overrules *R.T.G.* instead of limiting or clarifying it. That is, the majority's application of its holding here would have resulted in a completely different outcome in *R.T.G.*

{¶ 50} Yet the majority concedes that *R.T.G.* cannot be overruled here. That is because the majority is constrained by the hopelessly random and formulaic approach to overruling precedent set forth in *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256. The *Galatis*-related problems with overruling *R.T.G.* in the context of this appeal are that (1) neither the parties nor the court of appeals argues or otherwise suggests that *R.T.G.* was either wrongly decided or should be overruled, (2) even if appellee—the board of county commissioners—had requested that *R.T.G.* be overruled because it was wrongly decided, an incorrect decision satisfies only the first part of the court's three-part *Galatis* test to overrule precedent, and (3) there is no evidence or argument supporting the latter two requirements for overruling *R.T.G.* pursuant to *Galatis.* In *State ex rel. Grimes Aerospace Co., Inc. v. Indus. Comm.,* 112 Ohio St.3d 85, 2006-Ohio-6504, 858 N.E.2d 351, ¶ 6, this court denied a request to overrule precedent, because the appellant had failed to argue that the final two *Galatis* requirements were met.

{¶ 51} Thus, instead of explicitly overruling *R.T.G.,* the majority opinion arbitrarily distinguishes the facts in *R.T.G.* from the facts in this case. The majority concludes that *R.T.G.* "was largely dependent on unique circumstances," including that "[b]ecause a majority of the property had been leased for its coal rights, a separate mineral estate was created for the greater portion of R.T.G.'s land" and that R.T.G. "already had received conditional-use permits for some of the acreage and had been surface mining the coal in the area for ten years." The majority may have just as well have distinguished *R.T.G.* on the basis that in this case, the parties' names are different.

{¶ 52} The first limitation suggested by the majority is that as long as most of the total property acquired is only the mineral estate, the property owner will receive the benefit of the *R.T.G.* holding for any remaining property it owns in fee simple. This is a peculiar and arbitrary distinction. At issue in *R.T.G.* were approximately 500 acres owned by the coal-mining company: 200 acres of property in fee and approximately 300 acres of owned or leased coal rights only. *R.T.G.* at ¶ 5. We held that for all of this property—including that portion of the roughly 200 acres that R.T.G. owned in fee and was within the UFM-designated area—the mineral rights were severable and would be treated as the relevant parcel for R.T.G.'s taking claim. *R.T.G.* at ¶ 50. The fact that a majority of the acreage involved only mineral rights was not cited as a relevant fact in *R.T.G.* This court dealt with the property owned in fee separately, without consideration of the character of the other property. The majority's odd distinction is not supported by any logical or equitable rationale.

{¶ 53} The other limitation set forth by the majority—that R.T.G. had already received permits for some of its property before the regulatory taking occurred—

is also not a basis to distinguish this case from *R.T.G.* Both the United States Supreme Court and this court have recognized that the denial of a permit to allow a property use can constitute a compensable taking if the effect of the denial is to prevent all economically viable use of the land. *United States v. Riverside Bayview Homes, Inc.* (1985), 474 U.S. 121, 127, 106 S.Ct. 455, 88 L.Ed.2d 419; *State ex rel. BSW Dev. Group v. Dayton* (1998), 83 Ohio St.3d 338, 343, 699 N.E.2d 1271. And as the majority acknowledges, a regulatory-taking claim is not barred by the mere fact that the property owner acquired the property with knowledge of a preexisting land-use restriction. *Palazzolo v. Rhode Island* (2001), 533 U.S. 606, 627–628, 121 S.Ct. 2448, 150 L.Ed.2d 592; *State ex rel. Shemo v. Mayfield Hts.* (2002), 95 Ohio St.3d 59, 765 N.E.2d 345. R.T.G. had in fact received permits to mine only 107.4 of its roughly 500 acres at the time of the state's UFM designation. *R.T.G.* at ¶ 5–13. Therefore, for about 80 percent of its property, R.T.G. was in no different a position than Shelly was in here—without any permit to mine.

{¶ 54} The third flaw in the majority's holding is that its "limitation"—that "Shelly's sand and gravel interests in its property are not severable as separate property interests *because the deed did not specify a transfer of mineral rights alone,* but transferred fee simple to Shelly * * * "—was not raised by the parties or the court of appeals. (Emphasis added.) Neither party requested and the court of appeals did not conclude that *R.T.G.* should be so "limited." Instead, the board of county commissioners and the court of appeals sought to distinguish *R.T.G.* on the erroneous grounds of no vested rights, preexisting knowledge of land-use restrictions, and background principles of zoning law. *Shelly,* 2005-Ohio-6682, 2005 WL 3454751, ¶ 13–16, 20–21.

{¶ 55} The problem with deciding a case on an issue that did not form the basis for either the trial court's decision or the parties' arguments is that "[w]hile appellate courts have the power to *raise* issues sua sponte, they should cease *deciding* cases on such issues without giving the parties an opportunity to be heard through supplemental briefing and argument * * * [because the] failure to do so is inconsistent with the fundamental principles of due process that a party should have notice of, and the opportunity to be heard on, the determinative issue in the case." (Emphasis sic.) Milani & Smith, Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts (2002), 69 Tenn.L.Rev. 245, 315. The preferable course is to request supplemental briefing on issues that are not raised by the parties and that are susceptible of reasonable disagreement and are considered to be potentially dispositive. See, e.g., *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 28; *Kish v. Akron,* 106 Ohio St.3d 1402, 2005-Ohio-3118, 829 N.E.2d 1215; *State v. Yarbrough,* 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, ¶ 4.

{¶ 56} Finally, even if the majority's sua sponte overruling of *R.T.G.* were appropriate, it should have remanded the cause to the appellate court for further proceedings to permit Shelly to assert a *Penn Cent.* taking claim. It is hardly equitable to apply an overruling or "limitation" of precedent that neither party requested and then apparently simultaneously preclude the party harmed by that holding from raising a new taking claim. Because Shelly could not have reasonably foreseen that this court would apply a limitation to our *R.T.G.* holding that neither party advocated and the court of appeals did not find, Shelly could not have intentionally waived a *Penn Cent.* claim under these circumstances. Pursuant to *Penn Cent.*, the conditional-use limitation would not necessarily mean that Shelly's economic expectation of being able to obtain the permit to extract sand and gravel was so unreasonable that it would defeat Shelly's taking claim. This is particularly true when the denial of Shelly's conditional-use permit was affirmed by a sharply divided panel of the court of appeals in which even the majority found that the evidence supporting the denial was "far from overwhelming." *Shelly Materials, Inc. v. Daniels,* Clark App. No. 2002–CA–13, 2003-Ohio-51, 2003 WL 77176, ¶ 84.

{¶ 57} In sum, notwithstanding the majority's view that Shelly requests that we "expand" or "broaden" *R.T.G.,* Shelly simply requests that we apply *R.T.G.* here. So applied, *R.T.G.* does not require a separate purchase of the mineral estate in order for the estate to be considered the relevant parcel for a compensable regulatory taking. *R.T.G.* merely requires evidence that the property owner's interest in purchasing the property was solely for the purpose of mining the minerals. Id. at syllabus and ¶ 50. Consistent with the court's precedent in *R.T.G.,* Shelly submitted an uncontroverted affidavit that its sole purpose in purchasing the property was to mine sand and gravel. The board of county commissioners never contested that evidence.

{¶ 58} Therefore, because the court's holding effects a sub silentio overruling of *R.T.G.* that neither the parties nor the court of appeals requested and is not supported by any logical factual distinction, I dissent. Only *Galatis* keeps the majority from its true objective. Without *Galatis,* the court could have explicitly overruled *R.T.G.,* which would have at least lent clarity to takings law in Ohio. Now, parties will be left to wonder what the law is and which irrelevant fact from *R.T.G.* might be used in the future to further limit its application.

{¶ 59} Meanwhile, the evidence mounts against the precedential value of *Galatis.* As to its own magical second element—"workability"—*Galatis* continues to come up short, which may some day result in this court's overruling *Galatis* on the authority of *Galatis.* See Dwight Latham and Moe Jaffe, "I'm My Own Grandpa."

LUNDBERG STRATTON, J., dissenting.

{¶ 60} With the exception of the comments regarding *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, I join the dissenting opinion of Justice Pfeifer.

Bieser, Greer & Landis, L.L.P., Carla J. Morman, and David C. Greer, for appellant.

Onda, LaBuhn, Rankin & Boggs Co., L.P.A., Timothy S. Rankin, and Benjamin W. Ogg; Stephen A. Schumaker, Clark County Prosecuting Attorney, and Andrew J. Pickering, Assistant Prosecuting Attorney, for appellee.

Brady, Coyle & Schmidt, L.L.P., Brian P. Barger, and Margaret G. Beck, urging reversal for amicus curiae, Ohio Aggregates and Industrial Minerals Association.